**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. 1:25-CR-224** |
| | : | |
| **ELIAS RODRIGUEZ,** | : | **ORAL ARGUMENT REQUESTED** |
| | : | |
| **Defendant.** | : | |

**MOTION FOR A SCHEDULING ORDER**
**SETTING A DEADLINE FOR THE DEFENSE'S PRESENTATION OF**
**MITIGATING EVIDENCE TO THE U.S. ATTORNEY**

## INTRODUCTION

The investigation and presentation of mitigating evidence is of paramount importance in any capital-eligible case. After all, mitigating evidence can be the difference between a life sentence and a death sentence. For this very reason, the Federal Death Penalty Act and the Department of Justice's Capital Crimes Protocol both contemplate that decisions about use of the death penalty will not be made before the defense is afforded a reasonable opportunity to present mitigating evidence to the decisionmaker. Consistent with these principles, for the last 15 years, the government has scheduled defense mitigation submissions roughly 15 months after a capital-eligible indictment in order to afford the defense an adequate opportunity to investigate and develop mitigating evidence that counsels against a capital authorization.

In this case, the government has deviated from past practice and set a deadline that will not allow the defense to meaningfully participate in the process through which the government will decide whether to seek the death penalty against Elias Rodriguez. In an August 7th press conference announcing the indictment, U.S. Attorney Pirro rightly promised that the government would engage in a "rigorous" review process before making this "weighty decision." Yet, the government since has since proposed a timeline that is simply too quick to permit any meaningful submission of mitigating evidence—October 20th, just over two months after Mr. Rodriguez's indictment.

The government's decision to set such a rushed timeline here is unreasonable and aberrational. It would require the defense to complete and make its mitigation presentation roughly seven times faster than the average timeline the government has set in death-eligible cases over the past 15 years. In hastening the authorization process in Mr. Rodriguez's case, the government risks not only making a life-or-death decision on incomplete information but also wasting judicial and governmental resources. As a practical matter, the government's proposed

timeline simply does not afford defense counsel enough time to identify and present the mitigating evidence that the government will need in order to make a reasoned authorization decision in this case. As a constitutional matter, any investigation and submission that counsel might conduct and prepare during this abbreviated timeline would fall short of what professional norms require, depriving Mr. Rodriguez of effective representation required by the Sixth Amendment. This is particularly true in light of the deferred payment for Criminal Justice Act counsel and the recent rise in federal prosecutions in the District of Columbia, which has created an unprecedented strain on the resources of the judiciary, the Department of Justice, and defense counsel.

  This Court can, and should, exercise its inherent authority to enter a Scheduling Order that establishes a reasonable timeline for the defense's mitigation submission to the local U.S. Attorney's Office. Mr. Rodriguez acknowledges that some courts have ruled that separation-of-powers concerns precluded them from entering an order like that requested here—even while recognizing the wisdom of granting additional time. But for the reasons discussed herein, this Court should decline to follow the logic of those courts. This Court's inherent authority gives it the power to enter the type of scheduling order requested. Further, the defense's proposed schedule sets a date that is reasonable. It accounts for the complexities of this case and current circumstances, and it protects Mr. Rodriguez's Sixth Amendment right to counsel at this stage without sacrificing the important public interest in efficiently resolving this matter.

  Thus, in light of the fast-approaching government-proposed October 20th deadline, Mr. Rodriguez now files this Motion. The defense respectfully requests entry of a scheduling order that gives the defense until on or before March 19, 2026, to make its mitigation presentation to the local U.S. Attorney's Office. Given the importance of this matter, the defense also respectfully requests that the Court hear oral argument on this Motion.

## FACTUAL AND PROCEDURAL BACKGROUND

The government alleges that Elias Rodriguez is responsible for shooting and killing two Israeli Embassy employees on the evening of May 21, 2025, outside the Capital Jewish Museum in Washington, D.C. According to a criminal complaint, Mr. Rodriguez was arrested by D.C. Metropolitan Police Department officers at the scene. Aff. in Support of Compl., ECF 1-1, at 3. Further, the complaint alleged that, at the time of his arrest, Mr. Rodriguez stated: "I did it for Palestine, I did it for Gaza, I am unarmed," and later shouted "Free Palestine." *Id.* The complaint filed May 22, 2025, alleged violations of federal and D.C. law, specifically, murder of a foreign official, 18 U.S.C. § 1116; causing death through use of a firearm, 18 U.S.C. § 924(j); discharging a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii); and first-degree murder, D.C. Code § 22-2101. Compl., ECF 1.

Mr. Rodriguez was appointed counsel shortly thereafter. On May 22nd, he received counsel through the Federal Public Defender for the District of Columbia. *See* Minute Order, May 22, 2025; Notice of Att'y Appear., ECF 8; Notice of Att'y Appear., ECF 9. Then, on June 11th, based in part on representations by the government that it might bring capital charges and seek a sentence of death, Magistrate Judge Faruqui declared the case complex. Order, ECF 15. Shortly thereafter, on June 17th, Chief Judge James Boasberg appointed Criminal Justice Act "learned counsel" to assist in the representation of Mr. Rodriguez. Order, ECF 17; *see* 18 U.S.C. § 3005 (any case involving indictment on a capital crime requires "prompt[]" appointment of at least one counsel who is "learned in the law applicable to capital cases").

The grand jury returned an indictment approximately one month later. On August 6th, Mr. Rodriguez was charged by indictment with one count of killing a foreign official, 18 U.S.C. § 1116(a), which carries a possible penalty of death; two counts of committing a hate crime resulting in death, 18 U.S.C. § 249(a)(2); two counts of using, carrying, and discharging a

firearm during and in relation to a crime of violence and, in the course of that violation, causing death, 18 U.S.C. §§ 924(c) and 924(j), which also carry a possible penalty of death; two counts of first-degree murder while armed, D.C. Code §§ 22-2101 and 22-4502; and two counts of assault with intent to kill while armed, D.C. Code §§ 22-401 and 22-4502. In addition, the indictment contains a Notice of Special Findings Pursuant to 18 U.S.C. §§ 3591 and 3592—a statutory prerequisite to any formal decision by the government to seek the death penalty.

The next day, U.S. Attorney Pirro convened a press conference addressing the indictment. After describing the charges, U.S. Attorney Pirro took note of the Notice of Special Findings and discussed the government's deliberative process over whether to seek the death penalty. She explained:

> This begins the statutory process in whether to seek the death penalty. This is a weighty decision; it takes time; there will be a rigorous process after which the Capital Case Section in the Attorney General's office will advise the Attorney General, and the Attorney General herself will make a decision regarding whether or not this office will seek death against Elias Rodriguez.

Press Conf. at 07:05–07:36, U.S. Attorney's Office for the Dist. of Columbia, *U.S. Attorney Pirro Provides Update on Capital Jewish Museum Shooting* (Aug. 7, 2025), https://tinyurl.com/f2x5wrjw. Further, U.S. Attorney Pirro emphasized that the capital review procedure is a "very rigorous internal process," intended to review cases to "determine whether the death penalty is appropriate." *Id.* at 18:35–18:41. She went on to describe this rigor, explaining that the review "includes an examination of all of the evidence and of the charges," provides the defendant an opportunity to submit information to the government for its consideration, and enables the families of victims to provide their input. *Id.* at 18:45–19:03, 24:18–24:40. Only after this rigorous process is completed, U.S. Attorney Pirro stated, can the government make its determination as to whether to seek the death penalty. *Id.* at 19:03–19:12.

The inclusion of special findings in the indictment, she reiterated, simply starts this process. *Id.* at 19:15–19:22.

Consistent with U.S. Attorney Pirro's statements, the government moved forward with the authorization process and the parties exchanged letters about the attendant timeline. The government initially asked the defense to provide a written submission to U.S. Attorney Pirro's office by September 19th and to make an oral presentation shortly thereafter. Undersigned counsel responded on August 27th to explain that this proposed timeline was too short for the defense to conduct a sufficient mitigation investigation, particularly given that it had just recently brought on a mitigation specialist, and to become familiar with the evidence. Thus, the defense asked the government to afford the defense six months to provide its written submission. While that request was pending, the government produced more than a terabyte of additional discovery. Then, Mr. Rodriguez was arraigned before this Court on September 4th. During the arraignment, the government confirmed the extraordinary volume of discovery in this case—in excess of one and a half million pages—and the Court granted the government's oral motion for a complex-case designation. Mr. Rodriguez entered a plea of not guilty to all of the charges in the indictment. On September 8th, the government responded to defense counsels' letter to state that the defense would be afforded only a thirty-day extension—until October 20th—to make its written mitigation submission.

Understanding that the parties are at an impasse over the timeline of the defense's mitigation submission, the defense now turns to this Court.

# LEGAL BACKGROUND

**A.**    **In death-eligible cases, the Constitution, statutory law, and the government's Capital Case Protocol acknowledge that it is paramount the defense investigate and present mitigating evidence.**

*1.    The Constitutional Framework*

Presenting mitigating evidence in a capital case is of paramount importance. "There is no question that death as a punishment is unique in its severity and irrevocability." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (citing *Furman v. Georgia*, 408 U.S. 238, 286–91 (1972) (Brennan, J., concurring); *id.* at 306 (Stewart, J., concurring)); *see also Ring v. Arizona*, 536 U.S. 584, 605–06 (2002) ("no doubt that '[d]eath is different'" (citation omitted)). Accordingly, capital cases have "qualitative difference[s]" from their non-capital counterparts. *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985) (quoting *California v. Ramos*, 463 U.S. 992, 998–99 (1983)); *see also United States v. Karake*, 370 F. Supp. 2d 275, 277 (D.D.C. 2005). In recognition of this uniqueness, the Supreme Court "has been particularly sensitive to insure that every safeguard is observed." *Gregg*, 428 U.S. at 187. Among these safeguards is long-established recognition of a capital defendant's right to investigate and present all relevant mitigating evidence—that is, any "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke*, 542 U.S. 274, 284–85 (2004) (citation omitted).

Indeed, the Sixth Amendment's promise of effective representation requires counsel to investigate mitigating evidence. Counsel has a "duty to make reasonable investigations," and the reasonableness of counsel's investigation is assessed against "prevailing professional norms," such as those established by the American Bar Association ("ABA"). *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003) (citing and discussing *Strickland v. Washington*, 466 U.S. 668 (1984)). It follows that, if counsel fails to engage in a reasonable mitigation investigation—such as that

envisioned by the ABA's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (Feb. 2003), *reprinted in* 31 HOFSTRA L. REV. 913 (2003) (the "ABA Guidelines")—then the defendant has been deprived of his Sixth Amendment rights. *E.g.*, *Wiggins*, 539 U.S. at 524–27 (finding Sixth Amendment violation in light of defense counsel's unreasonable mitigation investigation).

The constitutional safeguards applicable in capital cases afford protection to defendants who have been charged with capital-eligible crimes and against whom the government is considering seeking the death penalty. Recognizing that death-eligible cases are different, another judge on this Court has admonished the government, even when cases are merely capital-eligible and still in a pre-authorization posture, to "err on the side of disclosure when interpreting its [discovery] obligations given the need for the utmost reliability in capital proceedings." *United States v. Karake*, 281 F. Supp. 2d 302, 306 (D.D.C. 2003). For the same reason, other courts have granted defense discovery requests as part of the authorization process. *E.g.*, *United States v. Delatorre*, 438 F. Supp. 2d 892, 899–900 (N.D. Ill. 2006) (where government was considering whether to seek death penalty, the question of pre-authorization discovery "warrants especially careful treatment as capital punishment is qualitatively different than any other form of punishment"); *United States v. Wilson*, 518 F. Supp. 3d 678, 686–88 (W.D.N.Y. 2021) (even in *potentially* capital cases, evidence relevant to statutory mitigating factors is relevant for purposes of Federal Rule of Criminal Procedure 16).

### 2. *The Federal Death Penalty Act*

The constitutional significance of defense investigation and of mitigating evidence, even before a capital-eligible case is authorized for capital prosecution, is reflected in both the statutory law and the internal protocols that govern the identification and prosecution of federal death-penalty cases. Both the Federal Death Penalty Act and the Capital Crimes section of the Department of Justice's Justice Manual, discussed *infra*, expressly recognize that the authorization of cases for capital prosecution is a deliberative process informed by relevant mitigating factors.

Federal capital cases are governed by the Federal Death Penalty Act, 18 U.S.C. § 3591, *et seq.* (the "FDPA"), which prescribes the process for trying and punishing any individual charged with an offense for which a sentence of death is sought. *See United States v. Safarini*, 257 F. Supp. 2d 191, 195–96 (D.D.C. 2003); *see also, e.g.*, *United States v. Cordova*, 806 F.3d 1085, 1100–01 (D.C. Cir. 2015). Consistent with *Gregg*, 428 U.S. 153, the FDPA provides that a defendant against whom the government is seeking the death penalty will, upon conviction of a death-eligible crime, proceed to a separate sentencing hearing—the so-called "penalty phase"—at which the jury determines whether "imposition of a sentence of death is justified." 18 U.S.C. § 3591(a). "The FDPA contains several steps the jury . . . must go through before a sentence of death can be imposed on a defendant who is found guilty of a capital crime." *United States v. Cooper*, 91 F. Supp. 2d 90, 94 (D.D.C. 2000).

First, the jury must consider "threshold" or "gateway" factors relating to the defendant's intent. Specifically, at this stage, the government must prove, beyond a reasonable doubt, at least one of the four "intent factors" enumerated in § 3591(a)(2). *Id.* at 94–95. Those factors are designed to ensure the defendant had a sufficiently culpable mental state. They include, *e.g.*, a

finding that the defendant "intentionally killed the victim" or "intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act." 18 U.S.C. § 3591(a)(2). At this phase, the government must also prove beyond a reasonable doubt the existence of any aggravating factors noticed pursuant to 18 U.S.C. § 3593. *Id.* § 3593(c). The FDPA enumerates sixteen possible statutory aggravating factors, and the government may also allege aggravating factors not enumerated in the statute in order to "individualize the sentencing determination." *Id*. § 3592(c); *United States v. Higgs*, 353 F.3d 281, 320 (4th Cir. 2003) (quote).

If the government proves the gateway factors and the existence of one or more statutory aggravating factors, then the jury must engage in a weighing exercise to determine if a death sentence is justified. The jury weighs those aggravating factors that it unanimously finds the government proved against "***any*** mitigating factor" or factors (which it need not find unanimously), including but not limited to those identified by the defense. 18 U.S.C. §§ 3592(a)–(b), 3593(c) (emphasis added); *see Cooper*, 91 F. Supp. 2d at 101 ("*any* mitigating factor may be considered by the jury" (emphasis in original)); *Karake*, 370 F. Supp. 2d at 278 (same). The jury has the task of deciding whether "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death." 18 U.S.C. § 3593(e). Even if no mitigating factors exist, the jury must still determine "whether the aggravating factor or factors alone are sufficient to justify a sentence of death." *Id.*

Importantly, the FDPA limits the government's presentation of aggravating factors to avoid unfair surprise. Prosecutors may not present evidence of an aggravating factor—a necessity for seeking a sentence of death—unless the government has both presented that factor

to a grand jury for inclusion in the indictment and listed it in its earlier-filed notice of intent. *Id.* § 3593(c); *see also, e.g.*, *Higgs*, 353 F.3d at 298. If prosecutors believe "death is justified," then they must, "a reasonable time before the trial . . . , sign and file with the court, and serve on the defendant, a notice" that the government intends to seek the death penalty. 18 U.S.C. § 3593(c). This notice must "set[] forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death." *Id.* § 3593(a)(2); *see also Cooper*, 91 F. Supp. 2d at 94. The FDPA's notice-of-intent requirement serves the purpose of "guarantee[ing] all who are accused of capital offense[s] the right not to stand trial for their lives unless they have been provided notice a reasonable time before trial that in fact they are to stand trial for their lives." *United States v. Ferebe*, 332 F.3d 722, 730 (4th Cir. 2003).

### 3.    *The Justice Manual*

The government's process for deciding whether to seek the death penalty anticipates the FDPA's requirements. The Department of Justice's guidebook for federal prosecutors, the Justice Manual, contains a protocol for the handling of capital crimes ("the Protocol"). *See Cordova*, 806 F.3d at 1101. The Protocol represents "the policies and procedures for all Federal cases in which a defendant is charged, or could be charged, with an offense subject to the death penalty." Justice Manual ("JM") § 9-10.010. And it "provides for centralized review of any death penalty decision made by attorneys acting on behalf of the United States." *Cooper*, 91 F. Supp. 2d at 113 (quoting *In re United States*, 197 F.3d 310, 311 (8th Cir. 1999)). The Protocol's "review process," pursuant to which the government decides whether the death penalty should be sought, echoes the FDPA process at trial. Importantly, the process affords defense counsel an opportunity to provide information and meet with the government to advocate for a determination that the death penalty will not be sought (a "no-seek" decision). JM § 9-10.080.

This opportunity for a defense presentation "is of paramount importance," as it "can literally lead to a determination of life or death." *United States v. Gomez-Olmeda*, 296 F. Supp. 2d 71, 87 (D.P.R. 2003). In the government's own words, the "overriding goal" of its review process "is to allow proper individualized consideration of the appropriate factors relevant to each case." JM § 9-10.030.

The Justice Manual elaborates on the importance of the defense submission as part of the review process. Pursuant to the Justice Manual, a local U.S. Attorney who "is contemplating requesting authorization [from the Attorney General] to seek the death penalty . . . shall give counsel for the defendant a reasonable opportunity to present information . . . which may bear on the decision whether to seek the death penalty." *Id.* § 9-10.080. After "a reasonable period of time" has passed, the United States Attorney "shall submit to the Assistant Attorney General for the Criminal Division through the Capital Case Section his or her recommendation whether to seek the death penalty, along with [certain] materials" prescribed in the Manual. *Id.* Among other things, the United States Attorney's recommendation must include a "[d]eath penalty analysis" that "identif[ies] applicable threshold intent factors under 18 U.S.C. § 3591, applicable statutory aggravating factors under 18 U.S.C. §§ 3592(b)–(d), *and applicable mitigating factors* under 18 U.S.C. § 3592(a)." *Id.* § 9-10.080(A)(4) (emphasis added). The recommendation must also include "[a]ny documents or materials provided by defense counsel to the United States Attorney . . . in the course of the United States Attorney's Office's . . . death penalty review process." *Id.* § 9-10.080(F). And, while the Protocol prohibits prosecutors from seeking or threatening to seek the death penalty "solely for the purpose of obtaining a more desirable negotiating position," it provides that, as part of the review process, a United States Attorney "may agree to submit for the Attorney General's review and possible approval, a plea agreement

relating to a capital-eligible offense . . . ." *Id.* § 9-10.120. Accordingly, the Justice Manual not only contemplates input from the defense but also that the information the defense submits will inform the United States Attorney's analysis and recommendation.

The defense mitigation submission also informs the government's final decision whether to seek capital punishment. The United States Attorney's recommendation is sent to the Capital Review Committee (the "Committee"), a group of attorneys drawn from the Office of the Deputy Attorney General, the Office of the Assistant Attorney General for the Criminal Division, and various United States Attorneys' Offices. *Id.* § 9-10.130. If the local United States Attorney recommends seeking a death sentence, or if two or more Committee members "request a . . . conference," then the Committee "establish[es] a date and time for the Capital Review Committee to meet with defense counsel and representatives of the United States Attorney's Office . . . to consider the case." *Id.* The Committee then "review[s] the materials submitted by the United States Attorney . . . and any materials submitted by defense counsel" and "make[s] a recommendation to the Attorney General . . . " as to whether the government should seek the death penalty. *Id.* "The Attorney General will make the final decision whether the Government should file a notice of intent to seek the death penalty." *Id.* According to the Justice Manual, "[n]o final decision to seek the death penalty shall be made if defense counsel has not been afforded an opportunity to present evidence and argument in mitigation." *Id.*

At each step of this careful process, government lawyers—the United States Attorney, the Capital Review Committee, the Deputy Attorney General, and the Attorney General—assess information both in favor of *and against* seeking the death penalty. Specifically, they weigh "whether the applicable statutory aggravating factors and any non-statutory aggravating factors sufficiently outweigh the applicable mitigating factors to justify a sentence of death or, in the

absence of any mitigating factors, whether the aggravating factors themselves are sufficient to justify a sentence of death." *Id.* § 9-10.140(C). The Protocol requires them to resolve "ambiguity as to the presence or strength of aggravating or mitigating factors in favor of the defendant." *Id.* It also sets forth law-enforcement considerations that reviewers may take into account in deciding whether it is appropriate to seek death, including, *inter alia*, "[t]he strength and nature of the evidence," the defendant's conduct while incarcerated, and "[w]hether the defendant has accepted responsibility for his conduct as demonstrated by his willingness to plead guilty and accept a life or near-life sentence without the possibility of release." *Id.* § 9-10.140(D).

The Protocol provides limited means for withdrawing a notice of intent to seek the death penalty. It sets forth a process by which defendants may submit a request for the withdrawal of the authorization decision. *Id.* § 9-10.160(B). The Capital Case Section's evaluation of these so-called "deauthorization" requests is "limit[ed] . . . to determining if . . . changed facts and circumstances, had they been known at the time of the initial determination, would have resulted in a decision not to seek the death penalty." *Id.* Successive deauthorization requests are not considered by the Capital Case Section except in "extraordinary circumstances." *Id.*

**B.**  **This Court has authority to set a pre-trial schedule that includes a date for a mitigation presentation, and doing so guards against a violation of the Sixth Amendment right to counsel.**

This Court has authority to set deadlines that bear on the authorization process in the case before it. A district court has inherent "power . . . to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis N. Am. Co.*, 299 U.S. 248, 254 (1936). As a general matter, that power encompasses setting deadlines and entering scheduling orders that govern the pace at which litigation must proceed. *E.g.*, *United States v. W. R. Grace*, 526 F.3d 499, 508–09 (9th Cir. 2008) (en banc); *United States ex rel. Staggers v. Medtronic, Inc.*, No. 15-cv-392, 2024 WL 4492022, at *6 (D.D.C. Oct. 15, 2024)

(collecting additional cases). Relevant here, the government's decision whether to seek the death penalty is a case-management gating item; it affects the rest of the schedule.[1] Accordingly, "[i]n line with the mandate to effectuate the orderly administration of justice, district courts managing complex cases with death-eligible charges regularly set deadlines" by which the defense must make its mitigation presentation to the government. *See Spurlock*, 782 F. Supp. 3d at 994, 1002; *United States v. McGill*, No. 09-cr-2856, 2010 WL 1571200, at *3 (S.D. Cal. Apr. 16, 2010). Indeed, the Judicial Conference of the United States *directs* district courts to do so. *See* Judicial Conference, *Guide to Judiciary Policy*, Vol. 7, Pt. A, Ch. 6 § 670(a), (b)(1)–(2) (rev'd Jan. 2022). This also is consistent with the Protocol itself; it contemplates that courts will establish deadlines for the filing of notices of intent, which, working backwards, will guide the timing of the U.S. Attorney's recommendation and, in turn, the defense submission. JM § 9-10.060 (directing U.S. Attorney to "submit a capital-eligible case for review [by the Capital Case Section] no fewer than 90 days before the Government is required, by an order of the court, to file a notice that it intends to seek the death penalty"). Once the defense's pre-authorization submission is made, the government then can engage in a meaningful deliberative process over whether to pursue capital punishment, and the case can move forward towards a trial or non-trial disposition. *See id.* § 9-10.130.

---

[1] If the government seeks the death penalty, then proceedings in this matter—including the pre-trial motions schedule, jury selection, and the trial itself—will operate on an extended timeline, with some parts requiring bifurcation or even trifurcation. *E.g.*, *United States v. Constanza-Galdomez*, --- F. Supp. 3d ---, 2025 WL 1712436, at *2 (D. Md. June 18, 2025) (jury selection "in a capital case often takes several months" and trials must be bifurcated); *United States v. Spurlock*, 782 F. Supp. 3d 987, 1003 (D. Nev. 2025) ("the government's decision to pursue capital punishment triggers resource-intensive processes in practically every arena of trial preparation—from appointment of counsel to motion practice to jury selection to qualification of experts"); *United States v. Bowers*, No. CR 18-292, 2023 WL 1108392, at *5 (W.D. Pa. Jan. 30, 2023) ("where a request for trifurcation has been made, the majority of courts grant such relief").

Other courts have entered this type of scheduling order before, as well as similar orders. For example, less than a year ago, in *United States v. Spurlock*, the district court set a deadline by which the defense needed to make its mitigation submission to the government. Status Conf. Tr., *United States v. Spurlock*, No. 23-cr-22 (D. Nev. July 18, 2024), ECF No. 132 at 21–22. In that case, the government "generally agreed that the timeline was reasonable" and "did not object." *Spurlock*, 782 F. Supp. 3d at 994. Courts have also entered scheduling orders that include deadlines for a defense mitigation submission even over the government's objection. *E.g.*, *United States v. Carrillo*, No. 20-cr-00265-YGR, 2020 WL 6591198, at *1 (N.D. Cal. Nov. 11, 2020); Order, *United States v. Jameson*, No. 18-cr-245 (N.D. Ok. Dec. 23, 2019), ECF 338 ("*Jameson* Order"); *McGill*, 2010 WL 1571200, at *5; *United States v. Benavides*, No. CR 06-62-M-DWM, 2008 WL 11638169, at *2–3 (D. Mont. Oct. 21, 2008). Consistent with their authority to set deadlines related to the authorization process, courts have enforced compliance with their scheduling orders as they relate to the timing of government submissions. *E.g.*, *Spurlock*, 782 F. Supp. 3d at 1025; *United States v. Dangleben*, No. 23-cr-72 (D.V.I. Aug. 18, 2025), ECF No. 213. Equally, entering this type of scheduling order is not unlike courts' well-recognized authority to manage the timeline of any deauthorization process. *E.g.*, *United States v. Saenz*, 721 F. Supp. 3d 188, 193–94, 198 (E.D.N.Y. 2022) (setting date for defense application for deauthorization); Order, *United States v. Nantz*, No. 19-cr-16-REW (E.D. Ky. Apr. 22, 2022), ECF 375 (setting date for government resolution of defense's pending deauthorization request); *United States v. Madison*, No. 17-cr-15-RBD-LRH (M.D. Fl. Feb. 18, 2021), ECF 725 (setting date for government to state on the record "whether it continues to seek the death penalty"). Accordingly, this Court has inherent authority to enter the scheduling order requested.

Entering a scheduling order that sets a deadline for a mitigation presentation also guards against a violation of the Sixth Amendment, which this Court has authority to prevent. The submission of mitigating evidence to the government as part of the authorization process holds "significant consequences for the accused." *See Bell v. Cone*, 535 U.S. 685, 695–96 (2002); *United States v. Crusius*, No. EP-20-CR-00389-DCG, 2020 WL 4340550, at *2 (W.D. Tex. July 28, 2020) (recognizing the "importance of a meaningful mitigation investigation for the pre-authorization mitigation presentation"). A meeting at which a defendant presses his argument for a non-capital sentence "can literally lead to a determination of life or death" and, therefore, is "a 'critical' stage of a criminal proceeding" at which "the Sixth Amendment right to counsel attaches." *Gomez-Olmeda*, 296 F. Supp. 2d at 87; *accord United States v. Pena-Gonzalez*, 62 F. Supp. 2d 358, 363–64 (D.P.R. 1999); *see also* ABA Guidelines 10.9.1 cmt., *reprinted in* 31 HOFSTRA L. REV. at 1041 ("[T]he mitigation investigation is crucial to persuading the prosecution not to seek death."). By entering a scheduling order with deadlines that ensure the defense has adequate time to investigate and prepare a mitigation presentation, the Court guards against a violation of a defendant's right to effective representation.

Thus, this Court has the power to set a schedule that includes deadlines pertaining to the authorization process. Independently, and in combination, the Court's inherent authority to manage its own docket and its obligation to guard against a violation of the defendant's constitutional rights support assessing the government's proposed deadline to ensure that it allows the defense adequate time to investigate and present mitigating evidence.

**ARGUMENT**

The defense respectfully asks the Court to enter a scheduling order that gives the defense until on or before March 19, 2026, to make its mitigation presentation to the local U.S. Attorney's Office. As explained at greater length below, the government's proposed schedule is objectively unreasonable, which warrants the Court's intervention. Meanwhile, the defense's proposed schedule is reasonable, because the defense needs the next six months to conduct its initial mitigation investigation and put together an effective presentation, consistent with the Sixth Amendment, and it is consistent with the average authorization timeline over the last 15 years. Finally, although there is a conflict of opinion over whether this Court has the ability to enter the scheduling order requested, the defense respectfully submits that the adverse persuasive authority is mistaken and those opinions should be set aside.

**A.     The government's proposed October 20th deadline for a defense mitigation presentation is objectively unreasonable.**

Any deadline for a defense mitigation presentation must account for the time it takes to investigate and prepare such a submission. As set out below, that process is time intensive. Adhering to the government's proposed October 20th deadline would force the defense to make an inherently deficient presentation to the government and, in turn, risk the prosecution "making an ill-informed decision regarding whether to seek the death penalty." *See Benavides*, 2008 WL 116382169, at *3. Thus, the October 20th deadline cannot stand.

> *1.     A reasonable deadline for a defense mitigation presentation accounts for the substantial time it takes to investigate and prepare such a submission.*

Building a constitutionally adequate mitigation case to present in support of a no-seek decision is a "difficult and time-consuming" task. ABA Guidelines 1.1 cmt., *reprinted in* 31 Hofstra L. Rev. at 923. When making its seek/no-seek decision, the government takes into consideration not only the statutory aggravating and mitigating factors under § 3592 but also

"any legitimate law enforcement or prosecutorial reason that weighs for or against seeking the death penalty." JM §§ 9-10.080(A), 9-10.140(D). As a result, preparing a mitigation presentation to the government requires counsel in a capital or capital-eligible case to conduct "a complete investigation of the defendant's life circumstances," including a "generally unparalleled investigation into personal and family history," in order to present anything that might militate against death. *Constanza-Galdomez*, 2025 WL 1712436, at *1 (first quote); ABA Guidelines 10.7 cmt., *reprinted in* 31 HOFSTRA L. REV. at 1022 (second quote). Among other things, the ABA directs that defense counsel in a capital or potentially capital case "needs to explore":

> (1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);
>
> (2) Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);
>
> (3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;
>
> (4) Military service (including length and type of service, conduct, special training, combat exposure, health and mental health services);
>
> (5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including
conduct while under supervision, in institutions of education or
training, and regarding clinical services).

ABA Guidelines 10.7 cmt., *reprinted in* 31 HOFSTRA L. REV. at 1022–23. To state the obvious,

the sheer volume of information to collect and process takes substantial time. What's more, the

logistics of gathering and studying numerous documents (*e.g.*, "school records," "social service

and welfare records," "juvenile dependency or family court records," etc.), as well as locating

and interviewing the defendant's family members "and virtually everyone else who knew" or

interacted with the defendant, are time-intensive. *See id.* at 1024–25. Finally, the defense must

develop the relationship of trust necessary to meaningfully confer with the client about his

formative experiences and to discuss acceptance of responsibility through a guilty plea. *See id.* at

1024; *see also* JM § 9-10.140(D)(9).

The scope of this investigation means that a qualified defense team necessarily consists

of members with different skill sets. Mitigation specialists play a particularly important role to

the defense, because they "possess clinical and information-gathering skills and training that

most lawyers simply do not have." ABA Guidelines 4.1 cmt., *reprinted in* 31 HOFSTRA L. REV.

at 959. Further, they "have the clinical skills to recognize such things as congenital, mental or

neurological conditions, to understand how those conditions may have affected the defendant's

development and behavior, and to identify the most appropriate experts to examine the defendant

or testify on his behalf." *Id.* Using these skills, mitigation specialists "compile[] a comprehensive

and well-documented psycho-social history of the client based on an exhaustive investigation;

analyze[] the significance of the information in terms of impact on development, including effect

on personality and behavior; find[] mitigating themes in the client's life history; identif[y] the

need for expert assistance; assist[] in locating appropriate experts; provide[] social history

information to experts to enable them to conduct competent and reliable evaluations; and work[]

with the defense team and experts to develop a comprehensive and cohesive case in mitigation."
*Id.* In short, they are "indispensable member[s] of the defense team throughout all capital
proceedings." *Id.* And, given their unique skill sets, a meaningful mitigation presentation to the
government cannot be made without having a mitigation specialist on the defense team and
allowing that specialist sufficient time to investigate the case.

　　　　　　　2.　　The October 20th deadline is objectively unreasonable.

　　　The October 20th deadline that the government has proposed for a defense mitigation
presentation is not reasonable. Here, the government directed the defense to make its mitigation
submission just over two months after the case was indicted with special findings, less than two
months after a substantial tranche of discovery has been produced, and soon after the defense
brought on a mitigation investigator. If forced to makes its submission on October 20th, then it is
unavoidable that the defense will miss—and the Capital Review Committee and Attorney
General will not have—significant pieces of mitigating evidence that should be relevant to the
seek/no-seek decision. Indeed, it is physically impossible for the defense to investigate
Mr. Rodriguez's life, review the voluminous discovery that has just been produced (as well as
the significant amount of discovery that has not yet been produced), and make a meaningful
mitigation submission by October 20th. *See, e.g.*, *Benavides*, 2008 WL 11638169, at *3
(government deadline for mitigation submission was objectively unreasonable when it predated
the court's discovery deadline). Moreover, as an ethical matter and under the ABA Guidelines,
defense counsel cannot advise their client as to the appropriateness of a potential plea—a factor
considered in the authorization process as part of the Protocol, *see* JM § 9-10.140(D)(9)—until
they have thoroughly reviewed the discovery and conducted necessary investigation. ABA,
*Criminal Justice Standards for the Defense Function* §§ 4-4.1, 4-6.1(b) (4th ed. 2017), *available*

*at* https://tinyurl.com/2s4ep5fp. Thus, the government's proposed deadline cannot be squared with counsel's obligations under the Sixth Amendment, which underlines its unreasonableness.

Proceeding on October 20th is particularly unreasonable given the practical realities facing defense counsel in this case. Two of Mr. Rodriguez's counsel are Assistant Federal Public Defenders who must balance their work on this case against an unprecedented onslaught of new prosecutions tied to increased federal law enforcement and the deployment of National Guard troops in Washington, D.C.[2] Counsel need not explain to this Court the ramifications that this tidal wave of new prosecutions has had on the workloads of the judiciary, the U.S. Attorney's Office, or the Federal Public Defender's Office. What's more, due to an unprecedented budgetary shortfall, court-funded Criminal Justice Act attorneys—of which undersigned learned counsel is one—have not been paid since July, and learned counsel on this case has yet to be paid at all.[3] This necessarily affects learned counsel's ability to devote all his time to this case between now and the government's proposed October 20th deadline. Suffice it to say that the government's proposed timetable for a mitigation submission, which would have been exceptionally difficult to meet under normal circumstances, is impossible to satisfy in light of the strains currently placed on Mr. Rodriguez's counsel.

Proceeding with an October 20th defense submission deadline will skew the government's entire deliberative process. While Mr. Rodriguez recognizes that neither the

---

[2] *See, e.g.*, Devlin Barrett, *In Washington Crackdown, Making a Federal Case Out of Low-Level Arrests*, N.Y. TIMES (Aug. 24, 2025), https://tinyurl.com/2x23xfz6; Ryan J. Reilly and Zoë Richards, *"Inexcusable": Federal magistrate judge demands answers after feds bump another case down*, NBC News (Sept. 4, 2025), https://tinyurl.com/363svdb3 (quoting court's characterization of current state of affairs as "unprecedented").

[3] *See, e.g.*, *Funding Crisis Leaves Defense Lawyers Working Without Pay*, U.S. Courts (July 15, 2025), https://tinyurl.com/5b2a9zpr; Melissa Quinn, *Defense lawyers for needy clients feel squeeze after congressional funding dries up*, CBS News (Aug. 11, 2025), https://tinyurl.com/2bwvhu7y.

protocol nor the FDPA contemplates that the defense will conduct its *entire* mitigation investigation before making a presentation to the government, the thoroughness and legitimacy of the government's decision-making process hinges on the defense's presentation of at least some meaningful quantum of information as to why the death penalty is inappropriate. Without the benefit of a meaningful defense presentation, it will be impossible for the government to resolve any "ambiguity as to the presence or strength of aggravating or mitigating factors" in Mr. Rodriguez's favor. JM § 9-10.140(C). In other words, the October 20th deadline undercuts the legitimacy of the government's own process. U.S. Attorney Pirro stated that the government intends to engage in a "rigorous" review process with respect to the "weighty decision" that has to be made in Mr. Rodriguez's case—which is consistent with the Supreme Court's recognition that "the decision to pursue the death penalty is a critical choice in the adversary process" because "whether to ask a jury to end the defendant's life is one of the most serious discretionary decisions a prosecutor can be called upon to make." *Williams v. Pennsylvania*, 579 U.S. 1, 11 (2016). Yet, the proposed timeline makes that impossible and undermines the government's own stated intention.

Contrasting the government's proposed date here with those in other capital cases makes the defense's point. Between 2010 and June 30, 2025, "[t]he average number of months between capital eligible indictment and the [Capital Review Committee] meeting for defendants that do not involve a reconsideration of a previous government 'no seek' decision (cases in which the Department of Justice during the Biden administration had previously decided not to pursue the death penalty) is 14.9 months." Ex. 1 (Decl. of Matthew Rubenstein ¶ 3, *United States v. Youngblut*, No. 25-cr-15 (D. Vt. June 30, 2025), ECF No. 80-2 (footnote omitted)). This average reflects the reality that defense teams require a meaningful period of time to undertake even the

preliminary mitigation investigation that necessarily precedes the government's decision whether to seek a sentence of death. Yet, the government here proposes that the defense complete and make its mitigation presentation at a speed roughly seven times faster than it has expected for the last 15 years.

The current deadline works "an artificial rush" of the authorization process that is likely to waste both government and judicial resources, as well as the public's money. *See Carrillo*, 2020 WL 6591198, at *3. It is well known that "an early decision not to seek death is the least costly way to resolve a potential capital charge," which means "a prompt preliminary mitigation investigation leading to effective advocacy with the local U.S. Attorney and with DOJ is critical both to a defendant's interests and to sound fiscal management of public funds." *Crusius*, 2020 WL 4340550, at *2 (cleaned up). Yet, as just discussed, if the defense is forced to make its submission by October 20th, then that submission will necessarily be incomplete, because it will omit all mitigation evidence the defense has not yet had the opportunity to investigate and submit. In light of that deficiency, the prosecution may seek to pursue the death penalty despite the existence of evidence that would counsel against it.

The fact that Mr. Rodriguez may later ask the government to withdraw any notice of intent to seek the death penalty does not render the October 20th deadline reasonable. The deauthorization review process is entirely separate from the authorization process and requires a different mitigation presentation (which itself is time consuming and resource-intensive to prepare); one is not a substitute for the other. Further, even if mitigating information continues to come to light as the defense investigation proceeds, the defense generally is limited to making a single deauthorization request, absent extraordinary circumstances. What's more, a rushed decision to authorize the case now, followed by a deauthorization process, would negatively

affect the proceedings before this Court in at least two ways. First, at the later deauthorization stage, which already is time intensive, counsel would require even more time than usual to investigate mitigating factors, in turn affecting the timeline of proceedings. Second, there would be needless repetition of motions practice. Specifically, if the case is hastily authorized now, then there will be significant litigation of various matters under the heightened scrutiny required for death-penalty cases. If the case is later deauthorized, then counsel likely will have to re-draft and the Court will have to reevaluate motions that had previously proceeded under the capital framework. Thus, this Court should not find that the October 20th deadline is reasonable based on the general existence of the deauthorization process.[4]

This Court should step in to ensure Mr. Rodriguez receives a meaningful opportunity to persuade the government not to seek the death penalty now. When the government presents the defense with an "objectively unreasonable" deadline for its mitigation submission, the appropriate remedy is a scheduling order that sets a reasonable deadline. *Carrillo*, 2020 WL 6591198, at *3. Accordingly, the defense asks the Court to enter a scheduling order with an objectively reasonable deadline for making a mitigation presentation to the government.

---

[4] Even the courts that (mistakenly) held that they lacked authority to enter the kind of scheduling order requested here, *see infra*, acknowledged the risk of wasting judicial resources by proceeding on a government-rushed authorization timeline. *Cf. Wilson*, 518 F. Supp. 3d at 682 (not entering requested scheduling order but noting that "insistence on moving forward with the current schedule of the DOJ meeting does not represent an efficient use of time and resources"); *United States v. Schlesinger*, No. CR-18-02719-001, 2019 WL 11853370, at *2 (D. Ariz. Sept. 12, 2019) (not entering requested scheduling order but reasoning that government's proposed timeline "would be unfair, unjust, and a vast waste of time and resources" and that, in contrast to the government's proposed deadline, "the schedule presented by the Defendant is a reasonable one that should be adopted by the local U.S. Attorney").

**B.    A defense mitigation-submission deadline of March 19, 2026, is objectively reasonable.**

The proposed schedule articulates a reasonable deadline. It provides the defense with six months (until March 19, 2026) to prepare a no-seek mitigation submission. That deadline is "calibrated to respect the government's process and avoid rushing or delaying it, while also protecting [Mr. Rodriguez's] rights." *See Spurlock*, 782 F. Supp. 3d at 1004.

The defense requires six months to prepare a no-seek mitigation submission. The defense needs this time to receive and review the government's voluminous discovery, the bulk of which has yet to be produced. Further, the defense brought on a death-penalty-experienced mitigation specialist just recently. The mitigation specialist and other members of the defense need the next six months to investigate the case in accordance with the ABA Guidelines and the Sixth Amendment. For all these reasons, the defense's submission deadline should be March 19, 2026.

The proposed schedule does not prejudice the government or the public. Setting "a date for the [defense's] mitigation presentation" to the Department of Justice "avoid[s] any risk that [Mr. Rodriguez] will be put at a disadvantage" while also "achiev[ing] the efficient and just resolution" of the seek/no-seek decision. *Benavides*, 2008 WL 11638169, at *2–3. This is not a situation in which even "brief delay in the defendant's presentation of mitigation evidence to the U.S. Attorney will hinder its ability to carry out its prosecutorial function." *Cf. Carrillo*, 2020 WL 6591198, at *3; *McGill*, 2010 WL 1571200, at *4; *Benavides*, 2008 WL 11638169, at *3. Nor does the proposed timeline needlessly prolong proceedings, which might compromise the public's interest in a timely resolution of this matter. Rather, the proposed schedule maps onto the authorization protocol while simultaneously accounting for the nuances of this case. Thus, there is no reason to believe that it prejudices the government or public.

**C.**    **Other courts have held that they lack authority to enter the type of scheduling order requested here, but those rulings rest on faulty reasoning.**

The defense acknowledges that there is a split in authority over the scheduling order it seeks. Those courts that go the other way generally reason that the internal Department of Justice process of receiving and reviewing a defense submission is separate from the proceedings before the court, so setting a deadline as to that submission is tantamount to "direct[ing] the Executive Branch [on] how to exercise its traditional prosecutorial discretion," in violation of separation-of-powers principles. *United States v. Slone*, 969 F. Supp. 2d 830, 833–34, 838 (E.D. Ky. 2013); *accord, e.g.*, Order, *United States v. Youngblut*, No. 25-cr-15 (D. Vt. July 18, 2025), ECF 90 ("*Youngblut* Order"); *United States v. Rivas-Moreiera*, No. 22-CR-27, 2023 WL 11960650, at *1 (E.D. Tex. Oct. 7, 2023); *Wilson*, 518 F. Supp. 3d at 682 (collecting additional cases). Further, some courts reason that defense counsel's mitigation presentation is not a "critical stage," so the Sixth Amendment is not implicated. *E.g.*, *Crusius*, 2020 WL 4340550, at *5 (collecting cases). Thus, there is a conflict over whether district courts can set a deadline for a defense mitigation presentation, as requested here.

Respectfully, those other courts' separation-of-powers concerns are misplaced. Entering a purely ministerial scheduling order does not violate separation-of-powers principles because it does not create rights under the government's Protocol, meddle in the government's internal process, or affect the government's substantive decision. *Jameson* Order at 2; *McGill*, 2010 WL 1571200, at *2–3; *Spurlock*, 782 F. Supp. 3d at 1002. Indeed, as another district court explained:

> There is no question that the decision whether to seek the death penalty is an internal one, and committed solely to the Department of Justice. However, the decision when to schedule the mitigation presentation impacts the Defendants and their counsel and is intertwined with the progression of this matter . . . [before this Court]. The situation is similar to that of the plea agreement: the trial court has no control over the internal decision of whether [the] government will choose to enter into a plea agreement, but it may

> set a deadline for any such plea agreement to be entered into by the
> parties.

*Benavides*, 2008 WL 11638169, at *3. Thus, the scheduling order the defense seeks is squarely

within this Court's authority, because it operates "purely to ensure this case proceeds to trial in

an orderly and expeditious manner." *McGill*, 2010 WL 1571200, at *4. Indeed, it furthers basic

case management goals of "avoid[ing] undue delay attributable to the Attorney General's

consideration of whether to seek the death penalty" and "unnecessary expense" incurred from

inefficient use of judicial resources, such as by "requiring [the] defendant to expedite his

gathering of mitigation evidence." *Id.* at *3–4.

What's more, the other courts are mistaken to think that the authorization process does

not implicate a defendant's rights under the Sixth Amendment. They mistakenly reason that it

cannot be a "critical stage" because it is a non-judicial administrative process, with no

opportunity for judicial review, and the final seek/no-seek decision is discretionary. *E.g.*,

*Crusius*, 2020 WL 4340550, at *5. But the Supreme Court already rejected that reasoning. In

holding that the plea bargain process is a "critical stage," the Supreme Court acknowledged that

"no formal court proceedings are involved"; the "process is often in flux, with no clear standards

or timelines and with no judicial supervision of the discussions between prosecution and

defense"; and the government's decision to extend an offer is entirely discretionary. *Missouri v.

Frye*, 566 U.S. 134, 143–44 (2012). None of that was dispositive. Rather, the dispositive factor,

the Court explained, is the "simple reality" that plea bargains are "so central to the

administration of the criminal justice system that defense counsel have responsibilities in

the plea bargain process, responsibilities that must be met to render the adequate assistance of

counsel that the Sixth Amendment requires in the criminal process at critical stages." *Id.* at 143.

Thus, the characteristics of the authorization process that concerned other courts are qualities that did not concern the Supreme Court at all when undertaking the critical-stage analysis.

The Supreme Court's reasoning in *Frye* maps neatly onto the authorization process and supports holding that it is a "critical stage" at which defendants must receive constitutionally effective representation. Just like plea negotiations are "almost always the critical point for a defendant" in a non-capital case (*id.* at 144), the authorization process is always a critical point for a defendant in a capital-eligible case (ABA Guidelines 10.9.1 cmt. (2003)). And just like plea negotiations can end in a plea agreement that obviates the need for a trial, an authorization process that ends in a no-seek decision could mean the difference between a trial or non-trial disposition. *See* JM § 9-10.120 (review process could end in plea agreement). It follows, then, that just as defense counsel have responsibilities in the plea bargain process, defense counsel have responsibilities in the authorization process that must be met to render effective assistance of counsel. *See Saenz*, 721 F. Supp. 3d at 194 (Sixth Amendment attaches to deauthorization proceedings; citing *Frye*, 566 U.S. at 140); *cf. Youngblut* Order at 1–2 (government's rushed deadline for a defense submission could "inadvertently create an issue of ineffective assistance of counsel and give rise to concerns regarding the fair administration of justice in the context of a crucial decision"). In other words, both the plea bargain process and the authorization process are "critical stages" to which the Sixth Amendment attaches.

For all these reasons, the Court can and should set aside the other courts' rulings. It has inherent authority to set the scheduling order, and any scheduling order it sets must be crafted with consideration for counsel's Sixth Amendment obligations to Mr. Rodriguez.

**CONCLUSION**

The defense respectfully asks the Court to enter a scheduling order that gives the defense until on or before March 19, 2026, to make its mitigation presentation to the local U.S. Attorney's Office.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

*/s/ Elizabeth Mullin*
Elizabeth Mullin
Diane Shrewsbury
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500

Eric K. Klein
Johnson & Klein, PLLC
5398 Manhattan Circle
Boulder, CO 80303
(303) 444-1885

Victor J. Abreu
Supervisory Assistant Federal Defender
Federal Community Defender Office, EDPA
601 Walnut Street, Ste 540 West
Philadelphia, PA 19106
(215) 928-1100