**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| v.  : | **CRIMINAL NO. 1:25-cr-224 (RDM)** |
| : | |
| **ELIAS RODRIGUEZ** : | |
| : | |
| **Defendant.** : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR A SCHEDULING ORDER SETTING DEADLINE FOR MITIGATION SUBMISSION

The Government respectfully opposes Defendant's motion seeking a scheduling order to control the Department of Justice's internal capital-review process (ECF No. 34). The decision whether and when to seek the death penalty is an executive prosecutorial function beyond the Court's authority, and courts routinely decline requests to intrude into that exclusive executive prerogative.

The Justice Manual's (JM) Capital Crimes Protocol is an internal DOJ guidance that contemplates giving defense counsel a "reasonable opportunity" to present materials to the United States Attorney, but those internal procedures do not create judicially enforceable rights or authorize a district court to set DOJ's internal calendar for capital review.

Permitting judicial control over DOJ's internal scheduling would conflict with separation-of-powers principles and exceed the Court's limited supervisory and docket-management powers, a point numerous courts have recognized in declining to grant the relief Defendant requests.

Nor does the Sixth Amendment compel the Court to intervene. DOJ's capital-authorization process, including the opportunity to submit mitigation materials, has repeatedly been held not to

constitute a "critical stage" of the criminal prosecution that triggers a right to court-mandated participation or timing, and this precedent forecloses the constitutional grounding the defense advances here.

Finally, even on the merits of reasonableness, the Government has afforded defense counsel an opportunity to present mitigation consistent with the Protocol and the realities of an active, complex investigation, and the requested scheduling relief would improperly substitute judicial micromanagement for prosecutorial judgment in the capital-authorization process.

For these reasons and those more fully explained below, the Court should deny Defendant's motion in its entirety.

**I. BACKGROUND**

On May 21, 2025, Elias Rodriguez shot and killed two individuals outside the Capital Jewish Museum (CJM) in Washington, D.C. The murders were captured on video, where Rodriguez can be seen shooting the victims at close range. After the shootings, he entered the CJM, pretending to seek assistance and shelter from the gunfire. Several minutes later, officers from the Metropolitan Police Department (MPD) arrived inside the CJM to investigate the gunshots. Rodriguez approached one of the officers and said, "I did it for Palestine, I did it for Gaza," and waived a *keffiyeh*[1] as he was taken into custody by MPD. He was charged by criminal complaint the following day with violations of 18 U.S.C. § 1116 (Murder of Foreign Officials); 18 U.S.C. § 924(j) (Causing the Death of a Person Through the Use of a Firearm); 18 U.S.C. § 924(c)(1)(A)(iii) (Discharge of a Firearm During a Crime of Violence); and D.C. Code § 22–2101 (First Degree Murder).

---

[1] The keffiyeh is often used as a symbolic gesture of solidarity with the Palestinian cause.

Rodriguez has four experienced lawyers. On May 22, the Court appointed Rodriguez counsel from the Federal Public Defender for the District of Columbia; two Assistant Federal Defenders formally entered their appearances on June 2. Two weeks later, on June 17, Rodriguez moved the Court to also appoint him "learned counsel" because "[t]he government has notified counsel that this is a 'death penalty eligible case' and the case is moving through the capital case certification process." (ECF No. 16.) Chief Judge Boasberg granted the motion and appointed learned counsel the same day; counsel entered his appearance on June 20. On August 1, Rodriguez's fourth attorney—a Supervisory Assistant Federal Defender who is the Chief of the Capital Trial Unit at the Federal Community Defender Office for the Eastern District of Pennsylvania—entered his appearance.

On June 6, the Government produced pre-indictment discovery consisting of two critical video recordings. The first captures the moment Rodriguez was taken into custody inside the CJM, as recorded by the body-worn camera (BWC) of the responding MPD officer. The second was a file recovered from a KaySunLink BWC worn by Rodriguez himself, capturing both video and audio, depicting the murders from a first-person perspective.[2] The Government produced voluminous post-indictment discovery in this matter on September 2, exceeding 550 GB of data and more than of one and a half million pages of discovery. This production chiefly included Defendant's own social media accounts, email accounts, and digital devices.

A federal grand jury returned a multi-count indictment on August 6 that includes the offenses listed above, as well as two counts of 18 U.S.C. § 249(a)(2) (Hate Crimes) and two counts

---

[2] Amazon records confirm that on May 18, 2025, Rodriguez purchased the KaySunLink BWC while still in Chicago and arranged for its delivery to his hotel in D.C. This transaction, executed days before the offense, underscores that he premeditated carrying out an act of violence in D.C. at least days in advance, and prior to his travel from Chicago.

3

of D.C. Code §§ 22-401, 4502 (Assault with Intent to Kill While Armed). The indictment also contains a Notice of Special Findings under 18 U.S.C. §§ 3591 and 3592, which renders the matter capital-eligible for purposes of the Federal Death Penalty Act.

On August 18, the Government invited defense counsel to submit mitigation information to the United States Attorney pursuant to DOJ's Capital Case Protocol. The Government's letter provided the defense with a deadline of September 19 for written mitigation submissions, with an oral presentation to follow by September 26. On August 27, defense counsel requested a six-month extension, citing the volume of discovery, the complexity of the case, and the need for additional preparation time to gather mitigation evidence. The Government considered the request and, on September 8, extended the written submission deadline to October 20, with an oral presentation to be scheduled at mutually agreeable time thereafter.

Despite this accommodation and ongoing cooperation, Defendant now seeks a court order extending the mitigation deadline to March 19, 2026, nearly five months beyond the already extended deadline. The Government opposes this request on both procedural and constitutional grounds.

## II. THE CAPITAL REVIEW PROCESS IS AN INTERNAL DOJ FUNCTION

The Department of Justice's Capital Case Protocol (or "the Protocol"), set forth in JM §§ 9-10.010 through 9-10.160, governs the internal process by which the Attorney General decides whether to authorize seeking the death penalty. The Protocol applies in every federal case in which the death penalty is statutorily authorized and establishes a uniform procedure for gathering information, considering aggravating and mitigating factors, and making a final determination regarding whether to seek the death penalty.

### A. The purpose and structure of the protocol

The Protocol is designed to ensure the decision is "based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws." JM § 9-10.030. It further ensures that "arbitrary or impermissible factors, such as a defendant's race, ethnicity, or religion, will not infect any stage of the decision-making process." *Id*. The process reflects the DOJ's commitment to a careful and deliberative process in capital cases, and the need for uniform standards across jurisdictions.

### B. The U.S. Attorney's role in recommending whether to seek the death penalty

The process begins with the local U.S. Attorney's Office conducting an initial assessment. In any case in which the U.S. Attorney is contemplating requesting authorization to seek the death penalty or otherwise believes it would be useful to the decision-making process to receive a submission from defense counsel, the U.S. Attorney notifies defense counsel and affords the defendant a reasonable opportunity to present mitigation. JM § 9-10.080. Defense counsel may submit written mitigation materials and request an in-person meeting with the U.S. Attorney. These submissions may address any factor counsel believes weighs against seeking the death penalty, including mental health, background, remorse, or other mitigating circumstances. The oral presentation is not an adversarial hearing, but rather an informal meeting intended to allow counsel to highlight key points and answer questions.

The U.S. Attorney then prepares a recommendation, which is forwarded to the Capital Review Committee (CRC) within the Criminal Division at DOJ. The CRC reviews the case file, the U.S. Attorney's recommendation, and any mitigation materials submitted by the defendant, and then makes its own recommendation to the Attorney General. JM §§ 9-10.080 & 9-10.130.

### C. The Capital Review Committee's role in recommending whether to seek the death penalty and decision by the Attorney General

The CRC is comprised of attorneys from the Office of the Deputy Attorney General, the Office of the Assistant Attorney General for the Criminal Division, and at-large federal prosecutors serving limited renewable terms. JM § 9-10.130. When a U.S. Attorney or Assistant Attorney General recommends seeking the death penalty, or when two or more CRC members request further review, the Capital Case Section coordinates a meeting between the CRC, the prosecution team, and defense counsel. *Id.*

The CRC reviews all prosecution and defense submissions and makes a recommendation to the Attorney General through the Deputy Attorney General. The CRC cannot render a final decision on whether to seek the death penalty without first providing defense counsel an opportunity to present evidence and argument in mitigation. *Id*. The Attorney General then makes the final determination on whether to file a notice of intent to seek the death penalty. *Id*.

## III. THE COURT LACKS AUTHORITY TO INTERVENE IN THE CAPITAL REVIEW PROCESS

Federal courts are courts of limited jurisdiction, possessing "only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). Neither the Constitution nor any statute grants courts general supervisory authority over the process by which the Executive Branch makes charging decisions.

The separation-of-powers doctrine prohibits judicial interference in prosecutorial discretion. The Executive Branch is vested with the authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. This includes the discretion to decide whether to

prosecute and what charges to bring. *See United States v. Nixon*, 418 U.S. 683, 693 (1974); *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 742 (D.C. Cir. 2016).

As noted above, the Attorney General makes the final determination on whether to file a notice of intent to seek the death penalty. This decision is a quintessential exercise of prosecutorial discretion, insulated from judicial review. *See Wayte v. United States*, 470 U.S. 598, 607 (1985) (charging decisions are "particularly ill-suited to judicial review"); *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (prosecutorial discretion is protected from judicial oversight).

The Justice Manual explicitly states that it "provides only internal Department of Justice guidance" and "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law." JM § 1-1.200; *see United States v. Caceres*, 440 U.S. 741, 755 (1979) (internal agency rules do not create enforceable rights unless mandated by statute or regulation). Nothing in the Justice Manual or the Capital Case Protocol suggests that a defendant has a right to judicial review of the process.

The internal nature of the capital review process is further supported by binding case law. Recognizing the Justice Manual only as internal guidance for DOJ attorneys, the D.C. Circuit held that the guidelines and policies set forth in the Justice Manual do not create enforceable rights for criminal defendants. *See United States v. Blackley*, 167 F.3d 543, 548-49 (D.C. Cir. 1999) (rejecting the premise that a purported violation of the Justice Manual provides a remedy for a criminal defendant because "violations of [Justice] Manual policies by DOJ attorneys or other federal prosecutors afford a defendant no enforceable rights."). Other federal courts of appeals uniformly agree. *See*, *e.g.*, *United States v. Cooks*, 589 F.3d 173, 184 (5th Cir. 2009) (recognizing that "[t]he USAM[3] itself makes plain that it 'provides only internal guidance'"); *United States v.*

---

[3] The Justice Manual was formerly known as the United States Attorneys' Manual ("USAM").

*Lopez-Matias*, 522 F.3d 150, 155-56 (1st Cir. 2008) (holding a violation of Death Penalty Protocol did not support the district court's decision to strike the notice of intent to seek the death penalty); *United States v. Jackson*, 327 F.3d 273, 295 (4th Cir. 2002) (holding that it is "internal prosecutorial protocols do not vest defendants with any personal rights"); *United States v. Lee*, 274 F.3d 485, 493 (8th Cir. 2001) (holding in a federal capital case that the Protocol does not create enforceable rights for the defendant); *United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000) (holding that DOJ's internal procedures do not create enforceable rights). Logically, then, DOJ's internal capital-review process is not reviewable by the Court.

In rejecting a similar motion seeking court intervention to force the prosecution to delay its deadline for the defendant to provide mitigation materials to the United States Attorney prior to her making her death penalty recommendation to the Attorney General, a district court in Massachusetts explained that "[t]he opportunity extended by the protocol to the defendant to submit information and materials for consideration in the Department's internal deliberation does not create a legal right that can be overseen and enforced by the Court." *United States v. Tsarnaev*, No. 13-cr-10200, 2013 WL 5701582, at *2 (D. Mass. Oct. 18, 2013). Indeed, any opportunity for the defendant to provide mitigation materials to the government "is essentially a matter of grace." *Id.*

Other courts agree. *See, e.g., United States v. Crusius*, No. EP-20-cr-389, 2020 WL 4340550, at *4 (W.D. Tex. July 28, 2020) (holding that the Death Penalty Protocol does not give a court "authority to review whether the Government's scheduling of the pre-authorization mitigation presentation . . . affords Defendant a 'reasonable opportunity'"); *United States v. Slone*, 969 F. Supp. 2d 830, 834 (E.D. Ky. 2013) (denying a similar motion because, in part, the Death Penalty Protocol "cannot empower this Court to issue the scheduling order Slone seeks"); *United*

*States v. Cisneros*, No. 01-cr-1709, 2002 WL 35649521, at *5 (D.N.M. Dec. 10, 2002) (holding the court had no power to grant defendants' request to extend time for them to present mitigation information to the United States Attorney because, among other reasons, the defendants had "demonstrated no judicially enforceable substantive or procedural rights applicable to that protocol").

As the foregoing makes clear, the Death Penalty Protocol creates no legally enforceable right for Rodriguez to present mitigation information to the United States Attorney before she formulates her death-penalty recommendation. Any alleged deviation from prior practice, or even from the Protocol itself, therefore, provides no basis for this Court to intervene into the Government's internal decision-making processes or to postpone the Government's deadline for the initial submission of mitigation materials to the United States Attorney.

It is true that "district courts managing complex cases with death-eligible charges regularly set deadlines by which the government must provide notice of intent to seek the capital punishment" pursuant to 18 U.S.C. § 3593(a). *United States v. Spurlock*, 782 F. Supp. 3d 987, 1002 (D. Nev. 2025). But the defendant's motion quoted only part of this sentence from *Spurlock* to inaccurately claim that district courts "regularly set deadlines by which *the defense must make its mitigation presentation to the government*." Mot. at 15 (emphasis added). Those are two different propositions: A court's authority to impose a deadline on the *government* for the *filing* of a statutory notice does not commensurately provide a court with authority to *extend* a non-judicial deadline for the *defense* to provide information to the government. *See United States v. Tsarnaev*, No. 13-cr-10200, 2013 WL 5701582, at *2 (D. Mass. Oct. 18, 2013) ("[W]hat the defendant asks is that the Court set dates for events occurring not in the course of the judicial

9

proceeding but rather in the course of the Department's internal deliberations. That would be well beyond the scope of any inherent authority to manage judicial business.").

Indeed, far from courts "regularly" ordering the government to allow the defense additional time to submit mitigation evidence to the government, there appears to be only four courts that have done so. *See United States v. Carrillo*, No. 20-cr-265, 2020 WL 6591198, at *3 (N.D. Cal. Nov. 11, 2020); *United States v. Jameson*, No. 4:18-cr-245 (N.D. Okla. Dec. 23, 2019) (ECF No. 338) (unpublished); *United States v. McGill*, No. 09-cr-2856, 2010 WL 1571200, at *3 (S.D. Cal. Apr. 16, 2010); *United States v. Benavides*, No. 06-cr-62, 2008 WL 11638169, at *3 (D. Mont. Oct. 21, 2008). And the reasoning in these decisions has since been soundly and explicitly rejected. *See, e.g., United States v. Youngblut*, No. 25-cr-15 (D. Vt. July 18, 2025) (ECF No. 90) (unpublished) ("The overwhelming majority of courts have held that a federal court, due to the separation of powers doctrine, has no authority to interfere in the Attorney General's Capital Case Review or dictate the protocol for that process. Courts have universally further found that a federal court may not require the government to follow its own written Capital Case procedures which provide in relevant part that the government 'shall give counsel for the defendant a reasonable opportunity to present any information for the consideration of the United States Attorney ... which may bear on the decision whether to seek the death penalty.'") (quoting Justice Manual § 9-10.080).

Judicial orders dictating the timing or manner of mitigation submissions would impermissibly intrude on this core executive function. As the *Youngblut* court held, "the court lacks the authority to grant Defendant's motion because the "both the process and the ultimate charging decision are the sole prerogative of the Executive Branch." *Id.*

The Supreme Court has repeatedly emphasized that charging decisions rest "in [the prosecutor's] discretion," *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978), and that such decisions are "ill-suited to judicial review" because they involve the assessment of "such factors as the strength of a case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan," which are " not readily susceptible to the kind of analysis the courts are competent to undertake." *Armstrong*, 517 U.S. at 465.

Allowing judicial intervention would undermine the uniformity and integrity of the Capital Case Protocol. It would invite case-by-case deviations, erode DOJ's ability to apply consistent standards, and disrupt the balance of powers between the branches of government.

The Justice Manual and Capital Case Protocol are not binding on the courts—or on DOJ. They are internal guidance documents that reflect DOJ policy rather than enforceable legal standards. And they cannot form the basis for this Court to grant Defendant's motion.

## IV. THE CAPITAL REVIEW PROCESS IS NOT A "CRITICAL STAGE" UNDER THE SIXTH AMENDMENT

The Sixth Amendment applies to "critical stages" of the prosecution, that is, proceedings where substantial rights of the accused may be affected in an adversarial setting. *United States v. Wade*, 388 U.S. 218, 226-27 (1967).

As a matter of law, a "critical stage" in criminal proceedings is a stage which affects the defendant's right to a fair trial. *Id.* at 224, 226. As guaranteed by the Sixth Amendment, a fair trial is one in which "evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." *Strickland v. Washington*, 466 U.S. 668, 685 (1984).

Applying these principles, multiple federal courts have concluded that DOJ's capital-review process is not a "critical stage" subject to Sixth Amendment scrutiny. *See*, *e.g.*, *United States v. Shakir*, 113 F. Supp. 2d 1182, 1186-91 (M.D. Tenn. 2000) (distinguishing the "administrative, discretionary decision-making process of whether to seek the death penalty" from "judicial proceedings, presided over by a judge," such as sentencing hearings and adult certification hearings, which have been held to be critical stages of a criminal proceeding for purposes of the Sixth Amendment); *United States v. Furrow*, 100 F. Supp. 1170, 1176-77 (C.D. Cal. 2000) (reasoning that DOJ's internal death-penalty authorization process is not a critical state of a criminal proceeding for Sixth Amendment purposes because it "does not affect any of a defendant's substantial rights," "does not reach the merits of the case," and is "fundamentally different" from other proceedings that have been recognized as critical stages inasmuch as it is informal).

The sound reasoning from those cases can be extended to the instant case. DOJ's capital review process, including the opportunities for defendants to present mitigation information, are fundamentally different from proceedings that have been deemed "critical stages." The Government's capital review is not a judicial process; rather, it is an internal function of prosecutorial discretion not subject to judicial review. *United States v. McVeigh*, 944 F. Supp. 1478, 1483 (D. Colo. 1996). Additionally, a criminal defendant's submission of mitigation information to the prosecution is not adversarial in nature. A defendant is given the opportunity to present information that may dissuade the Attorney General from seeking the death penalty, but there is no independent, neutral decisionmaker. Further, the process does not test the merits of the case and no substantial rights of the defendant are at risk. The process does not circumvent a trial or foreclose any merits arguments by the defense. Nor does it affect the defendant's broad right to

present mitigation information to the jury. Thus, in every material respect, the submission of mitigation information under the Death Penalty Protocol is not a "critical stage" to which the right to effective assistance of counsel attaches.

Rodriguez's reliance on two cases from the District of Puerto Rico, in which the same district judge found that the capital review process is a "critical stage" for purposes of the Sixth Amendment, is unavailing. *See* Mot. at 17 (citing *United States v. Pena-Gonzalez*, 62 F. Supp. 2d 358, 363 (D.P.R. 1999), and *United States v. Gomez-Olmeda*, 296 F. Supp. 2d 71, 87 (D.P.R. 2003)). The persuasiveness of these two cases is weakened by the fact that another judge in the same district reached a contrary conclusion. *See United States v. Torres-Gomez*, 62 F. Supp. 2d 402, 404-07 (D.P.R. 1999) (finding the ruling in *Pena-Gonzalez* "mistaken" and determining the Protocol does not implicate the Sixth Amendment). Indeed, no court appears to have adopted this reasoning. *See, e.g.*, *Shakir*, 113 F. Supp. 2d at 1188 (rejecting the analysis in *Pena-Gonzalez*); *Cisneros*, 2002 WL 35649521, at *5 (finding a majority of courts have "persuasively rejected" the reasoning of *Pena-Gonzalez*); *McGill*, 2010 WL 1571200, at *2 n. 2 ("The Court does not find persuasive the decisions of the District of Puerto Rico in *Pena-Gonzalez* and *Gomez-Olmeda*.").

In sum, the overwhelming weight of authority holds that DOJ's capital review process is an internal, non-adversarial exercise of prosecutorial discretion that does not implicate a defendant's substantial rights, does not resemble a judicial proceeding, and does not resolve issues on the merits, foreclose defenses, or alter the defendant's ability to present mitigation to a jury. The Protocol therefore falls well outside the category of "critical stages" to which the Sixth Amendment attaches.

## V. THE GOVERNMENT HAS PROVIDED A REASONABLE OPPORTUNITY FOR MITIGATION

The Department of Justice's Capital Case Protocol requires that a defendant be afforded a "reasonable opportunity" to present information to the United States Attorney before a charging recommendation is made. JM § 9-10.080. What constitutes "reasonable" is a fact-specific inquiry, informed by the complexity of the case, the stage of the proceedings, and the accommodations already extended. And, importantly, it is purely DOJ's province—rather than the Court's—to determine to what is "reasonable."

Here, the timeline provided to Rodriguez more than satisfies this standard. He was charged with capital-eligible offenses on May 22, 2025. Less than a month later, on June 17, defense counsel acknowledged that the government had informed the defense of the possibility of engaging with DOJ's capital review process. *See* ECF No. 16 (defense moving the Court to appoint him "learned counsel" because "[t]he government has notified counsel that this is a 'death penalty eligible case' and the case is moving through the capital case certification process."). The Court's appointment of learned counsel ensured that, from almost the outset of case, Defendant has had the benefit of experienced, death-qualified representation. Presumably, counsel would have begun shortly thereafter contemplating, if not actively pursuing, a mitigation strategy.

The Government initially set a mitigation submission deadline of September 19, but *at the defense's request* extended that deadline by more than a month, to October 20. The oral presentation to the United States Attorney will occur after that date, and the subsequent presentation to the Capital Review Committee will take place only after the U.S. Attorney's recommendation is complete. In practical terms, this schedule affords the defense over four

months[4] from the appointment of learned counsel, and nearly five months from indictment, to prepare and present mitigation to the U.S. Attorney and additional time after that to present to the Capital Review Committee.

The defense will have ample opportunity to gather records, consult experts, interview witnesses, and develop mitigation themes before the U.S. Attorney's meeting, and additional time thereafter before presentation to the Capital Review Committee. Nothing in the Justice Manual or case law supports the proposition that "reasonable opportunity" means unlimited time or the six-month extension sought here. The Government's schedule strikes the proper balance between affording the defendant a meaningful chance to be heard and ensuring the timely administration of justice. What is more, should the Attorney General direct prosecutors to seek the death penalty, the Protocol provides continued opportunities for defense counsel to present mitigation information to the Department prior to trial in support of a request to withdrawal a notice of intent to seek the death penalty. *See* J.M. § 9-10.160.

---

[4] Defendant's motion cites, at Exhibit 1, a declaration purporting to identify an average 15-month lapse historically between indictment and mitigation presentation to the Capital Review Committee. This time period is the wrong metric and irrelevant for six reasons. First, historic practice does not equate to reasonableness. Second, the starting time should be when the defense is on notice of the possibility of capital-eligible charges rather than the return of an indictment. Indeed, that is what occurred here, and even the declaration acknowledges the many cases in which the defense made a mitigation presentation to the CRC even prior to the return of an indictment. Third, the statistic runs the time from indictment to time of CRC presentation, but at present the defense is asking to delay an even earlier stage, presentation to the United States Attorney—something that by necessity must occur *before* any presentation to the CRC. Fourth, while the average (mean) time is almost 15 months, that is skewed by a few lengthy time-period outliers; the median—a much better indicator of what is typical—is only 11.9 months. Fifth, even by the declaration's own standards, it does not account for the 15 cases in which the defense presented mitigation evidence to the CRC *before* the indictment; if those cases were added, the median time from indictment to CRC presentation is down to 10.3 months. At bottom, the declaration does not bear on whether the time period the government has afford the defense to present to the United States Attorney is "reasonable" under the Protocol.

15

## VI. CONCLUSION

Defendant's motion seeks judicial intervention in an internal DOJ process that is committed to prosecutorial discretion and insulated from judicial review. The Government has already provided a reasonable opportunity for mitigation submissions, including an extended deadline, access to discovery, and flexibility in scheduling the oral presentation.

Granting the motion would undermine the separation of powers, disrupt the uniformity of the Capital Case Protocol, and invite judicial oversight into a domain reserved for the Executive Branch.

Accordingly, the Court should deny Defendant's motion.

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Christopher Tortorice*
Christopher Tortorice (TX Bar No. 24048912)
Jeffrey Nestler (DC Bar No. 978296)
Assistant United States Attorneys
United States Attorney's Office
601 D Street NW
Washington, DC 20530
christopher.tortorice@usdoj.gov
jeffrey.nestler@usdoj.gov