**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. 1:25-CR-224** |
| | : | |
| **ELIAS RODRIGUEZ** | : | |

# RESPONSE IN OPPOSITION TO GOVERNMENT'S MOTION FOR SCHEDULING ORDER AND TRIAL DATE, AND DEFENDANT'S PROPOSED SCHEDULING ORDER

The government has announced its intent to seek a sentence of death against Elias Rodriguez for what it claims are hate-crime-related shootings that occurred in May 2025. Invoking the goals of efficiency and expediency, the government asks the Court to issue a scheduling order that would prevent Mr. Rodriguez's counsel from fulfilling their ethical duties or conducting a constitutionally adequate investigation of this case. The government's proposed scheduling order would also severely curtail Mr. Rodriguez's exercise of his Fifth and Sixth Amendment rights and, given the nature of this case, would infringe on his Eighth Amendment right to be free from cruel and unusual punishment. The government's proposal would render the defense unable to review discovery (much of which remains outstanding), investigate mitigation, and litigate motions to the degree required by the Constitution and by professional standards. The government's proposal would also place unnecessary and unreasonable constrictions on the Court in its ability to consider matters in this most serious of cases. It would be unworkable as a

practical matter.[1] And, ironically, it would increase the risk of the uncertainty and unexpected delay that the government claims it is trying to avoid.

The Court need not join the government in this misguided effort. Courts presiding over capital cases routinely adopt prudent pretrial-scheduling approaches that keep the proceedings "on track" by phasing litigation, taking steps to eliminate redundancy, and deferring the setting of a trial date until the litigation has progressed enough to give all parties a clearer picture of the case and what a trial will actually entail. These courts recognize that an abbreviated timeline—like the 16 months from notice of intent to trial that the government proposes here—raises constitutional concerns and is neither efficient nor practical. It is telling that the government has cherry-picked sample cases that proceeded on accelerated schedules, failing to mention that this is not the norm.

Mr. Rodriguez's proposed schedule, attached as Exhibit A, avoids these pitfalls and is consistent with schedules adopted by courts in capital cases nationwide. The Court should adopt the defense proposal.

## I. Relevant Procedural History

Mr. Rodriguez was arrested on May 21, 2025, for shooting and killing Sarah Milgrim and Yaron Lischinsky outside the Capital Jewish Museum in Washington, D.C. The next day, he was charged via criminal complaint with violations of federal and D.C. law. On June 11, 2025, based in part on representations by the government that it might bring capital charges and seek a

[1] As an example of how seriously unworkable the government's proposal is, the government has proposed a deadline for defense discovery under Rule 16(b)(1)—evidence the defense intends to introduce at trial—of September 14, 2026 (i.e., three weeks from now), when the government is fully aware it still has not produced complete discovery to the defense, including what it has described as an additional hard drive's worth.

sentence of death, Magistrate Judge Faruqui declared the case complex. Pursuant to the Criminal Justice Act, "learned counsel" was appointed on June 17, 2025. *See* 18 U.S.C. § 3005 (any case involving indictment on a capital crime requires "prompt[]" appointment of at least one attorney "learned in the law applicable to capital cases").

The government filed an indictment on August 6, 2025, two and a half months after the shooting. On September 4, 2025, Mr. Rodriguez was arraigned on one count of killing a foreign official in violation of 18 U.S.C. § 1116(a); two counts of committing a hate crime resulting in death, in violation of 18 U.S.C. § 249(a)(2); two counts of using, carrying, and discharging a firearm during and in relation to a crime of violence and, in the course of that violation, causing death, in violation of 18 U.S.C. §§ 924(c) and 924(j); two counts of first-degree murder while armed, in violation of D.C. Code §§ 22-2101 and 22-4502; and two counts of assault with intent to kill, in violation of D.C. Code §§ 22-401 and 22-4502. The charged violations of §§ 1116(a) and 924(j) carried a possible penalty of death, and the indictment contained a notice of special findings pursuant to 18 U.S.C. §§ 3591 and 3592—a statutory prerequisite to any formal decision by the government to seek the death penalty. At a press conference the next day, United States Attorney Jeanine Pirro explained that the government would undertake a "rigorous internal" deliberative process concerning whether to seek the death penalty, and that this decision would "take[] time." Press Conf. at 07:05–07:36, U.S. Attorney's Office for the Dist. of Columbia, *U.S. Attorney Pirro Provides Update on Capital Jewish Museum Shooting* (Aug. 7, 2025), https://tinyurl.com/f2x5wrjw.

Soon thereafter, the government asked the defense to provide a written submission to the United States Attorney by September 19, 2025—just over a month after the filing of the indictment—and to make an oral presentation soon thereafter. Defense counsel explained that

they would need at least six months to conduct even the minimum fact and mitigation investigation necessary to make such a presentation. The government ultimately provided the defense a 30-day extension, until October 20, 2025. The defense then moved this Court for a scheduling order that would extend the rushed timeline imposed by the government. *See* ECF No. 34. At a hearing on September 24, 2025, the Court denied the motion on the ground that it lacked the authority to direct the timeline surrounding the government's decision whether to seek the death penalty. At the same time, the Court repeatedly emphasized that it recognizes the consequences at stake in this case and the accordant necessity of a fair and reasonable process. Thereafter, the government once again extended the deadline for Mr. Rodriguez's mitigation submission, giving the defense until December 9, 2025. It set the defense's oral presentation to U.S. Attorney Pirro for the same date.

Because of the government's timeline, the defense focused its efforts through the fall and winter on advocating for a determination not to seek the death penalty. The defense met with U.S. Attorney Pirro in December 2025 and, in direct response to questions and concerns raised during that meeting, provided the government a second written submission in January 2026. As required by DOJ protocols, the defense subsequently met with members of the Department of Justice's Capital Review Committee in March 2026. In these meetings, and in written submissions advocating against capital authorization, the defense consistently represented to the government that Mr. Rodriguez would accept responsibility for the charged conduct, enter a plea of guilty, and accept a sentence of life imprisonment if the government were to forego a capital prosecution.

These efforts required members of the defense to meet with their client on a regular and sustained basis, to conduct a preliminary mitigation investigation that involved building

relationships with their client's loved ones, and to begin to familiarize themselves with the voluminous electronic discovery that the government was continuing (and is still continuing) to produce. As a practical matter, none of this could be undertaken with an eye toward trial preparation; instead, the defense's focus, between May 2025 and May 2026, was on avoiding a capital authorization decision by the government. Because of this focus, and due to the delicate nature of the authorization process, the defense necessarily had to forego the kinds of investigative and legal efforts that would be expected in an adversarial posture, such as challenging the legality of the pre-authorization process and the strength of the government's evidence and specific charges, and engaging in expert retention and consultation.

Meanwhile, the government continued to make voluminous discovery productions. The government produced two hard drives on August 30, 2025 (containing a total of 1,352 GB of unindexed discovery between them, much of it audio-visual footage). On September 25, 2025, the government produced another 1.2 GB of discovery (much of it documentary), and the next day it gave the defendant access to a dashboard containing some 255 GB of video files. On November 18, 2025, the defense received another 148 GB of unindexed discovery. (The defense requested an index but to date has received no response from the government.) In total, this amounted to roughly 1.75 TB of discovery.

On February 4, 2026—some eight and a half months after the alleged offense conduct, and while the capital status of this case was still in flux—the government filed a superseding indictment against Mr. Rodriguez. In addition to charging Mr. Rodriguez with the same offenses alleged in the initial indictment, the superseding indictment charged him with four counts of acts of terrorism while armed in violation of D.C. Code §§ 22-3152, 22-3153(a), 22-3153(f), and 22-4502. Mr. Rodriguez was arraigned on the superseding indictment on March 3, 2026.

On May 15, 2026, the government filed a notice of intent to seek the death penalty ("NOI") against Mr. Rodriguez. In June 2026, counsel for the government told defense counsel that more discovery would be produced soon. At a status hearing on June 30, 2026, the defense communicated to the Court, without contradiction by the government, its understanding that another hard drive of discovery would be produced within the following few days. Defense counsel later followed up about the status of this production, but to date the promised additional hard drive of discovery has not arrived.

At the Court's direction, the parties conferred in an attempt to reach agreement regarding a pretrial scheduling proposal. The defense explained that it would be premature to schedule a trial date at this juncture, instead proposing tiered scheduling focusing first on discovery and death-penalty dispositive issues. The government indicated it would consider the proposal but believed its senior leadership would require setting a trial date. At that time, the government declined to propose a specific trial date or specific interim deadlines to the defense. The government thereafter submitted its Motion for Scheduling Order and Trial Date with no further communication with the defense about its proposal. ECF No. 59. Mr. Rodriguez now responds to that Motion and submits his own counterproposal.

## II. The Court Should Establish a Schedule that Accounts for the Constitutional Needs and the Realities of This Capital Prosecution.

### A. Capital cases are extraordinarily complex.

Capital cases demand extraordinary time and care. The Department of Justice itself recently recognized that "federal capital case prosecutions are known for ... the enormous amount of time, energy, and resources expended to prove the cases." *Restoring and Strengthening the Federal Death Penalty*, DOJ Office of Legal Policy (Apr. 24, 2026) at 15. These cases, in the DOJ's own estimation, are "among the most complicated and resource-

intensive of all federal criminal cases." *Id.* at 41. They "involve unique rules, procedures, and practices not found in any other type of criminal prosecution" and come with associated burdens on staffing and other costs. *Id.* The DOJ estimates that it is "typical[]" for federal prosecutors to "spend more than one year investigating and preparing for capital cases," and reports that U.S. Attorneys' Offices "regularly dedicate two or more Assistant U.S. Attorneys to work exclusively on these cases." *Id.* Capital trials "typically last[] three to six months," and the "dockets often involve well over 1,000 entries." *Id.* at 42.

The DOJ is right about this. "There is no question that death as a punishment is unique in its severity and irrevocability." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (citing *Furman v. Georgia*, 408 U.S. 238, 286–91 (1972) (Brennan, J., concurring), and *id.* at 306 (Stewart, J., concurring)); *see also Ring v. Arizona*, 536 U.S. 584, 605–06 (2002) (there is "no doubt that '[d]eath is different'" (citation omitted)). Capital cases have "qualitative difference[s]" from their non-capital counterparts. *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985) (quoting *California v. Ramos*, 463 U.S. 992, 998–99 (1983)); *see also United States v. Karake*, 370 F. Supp. 2d 275, 277 (D.D.C. 2005). Because of this uniqueness, the Supreme Court "has been particularly sensitive to insure that every safeguard is observed." *Gregg*, 428 U.S. at 187. Indeed, the government has recognized that the nature of this case entitles Mr. Rodriguez to "enhanced due process rights … ." Hearing Tr. (June 30, 2026) at 31. This Court has also said that, because this is a capital case, it is "dotting every I and crossing every T with respect to due process." *Id.* at 41.

Because of these qualitative differences, it is widely understood that the litigation involved in defending a capital case is "highly specialized and demanding." *Guide to Judiciary Policy, Vol. 7 – Defender Services, Ch. 6: Federal Death Penalty and Capital Habeas Corpus Representations*, § 620.30(b)(1) ("Procedures for Appointment of Counsel in Federal Death

Penalty Cases"). In a 2010 report regarding defense costs in federal capital cases, the Judicial Conference of the United States remarked that federal capital trials are "extremely complex from a case management perspective," consuming "enormous amounts of time and other resources" as well as "exact[ing] a significant emotional toll on all participants." *Report to the Committee on Defender Services, Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases*, Judicial Conference of the United States (Sept. 2010) ("Spencer Report Update"), at xi, *id.* at 79; *see also* Federal Judicial Center, *Benchbook for United States District Courts* (7th Edition) (February 2026) ("Capital cases are highly specialized, extraordinarily demanding, and known to raise numerous complex issues that require skilled attorneys and careful analysis.").

The American Bar Association's Guidelines ("ABA Guidelines"), which are regularly relied upon to define the standards for representation in capital cases,[2] explicitly recognize that "defending capital cases requires vastly more time and effort by counsel than noncapital matters." *See American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003), Commentary to Guideline 6.1, *reprinted in* 31 Hofstra L. Rev. at 967-68 (footnotes omitted); *see also id.*, Commentary to Guideline 10.8, *reprinted in* 31 Hofstra L. Rev. at 1032 ("Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case."). At the time the ABA promulgated its guidelines, "recent studies" had shown that "several thousand hours are typically required to

---

[2] *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) ("[W]e long have referred [to the ABA standards] as 'guides to determining what is reasonable.'") (quoting *Strickland v. Washington,* 466 U.S. 668, 688 (1984)); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing ABA standards to evaluate trial counsel's performance); *Rompilla v. Beard*, 545 U.S. 374, 387-88 (2005) (same); *Smith v. Quarterman*, 471 F.3d 565, 570 (5th Cir. 2006) (citing guidelines).

provide appropriate representation." *Id.* And this work can only begin in earnest once counsel know that a case is capital, because only then can the defense prepare its theory of the case accordingly: defense counsel cannot develop a cohesive trial theory (as their ethical obligations require) until they have thoroughly investigated both the guilt/innocence-related evidence and all mitigation evidence (as their ethical obligations also require). As the ABA Guidelines explain:

> Formulation of and adherence to a persuasive and understandable defense theory are vital in any criminal case. In a capital trial, the task of constructing a viable strategy is complicated by the fact that the proceedings are bifurcated. The client is entitled to have counsel insist that the state prove guilt beyond a reasonable doubt. At the same time, if counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer may be damaged and the defendant's chances for a non-death sentence reduced. Accordingly, it is critical that, well before trial, counsel formulate an integrated defense theory that will be reinforced by its presentation at both the guilt and mitigation stages. Counsel should then advance that theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument.

*Id.*, Commentary to Guideline 10.10.1, *reprinted in* 31 Hofstra L. Rev. at 1047–48.

The government seeks to portray this case as straightforward regarding Mr. Rodriguez's guilt. After all, there is video evidence and Mr. Rodriguez admitted to police that he was the shooter. But the manner in which the government has chosen to charge this case, and potentially inconsistent positions raised in the NOI, portend significant litigation that will shape how any guilt/innocence phase of a trial will play out. It is likewise anticipated that there will be significant litigation over the validity of the capital-eligible charges. As the ABA Guidelines suggest, Mr. Rodriguez's counsel cannot begin to prepare a capital case until they know (i) the specifics of the charges to be litigated at a guilt/innocence phase, and (ii) that the case will remain capital by the time of trial. Given the importance of avoiding "contradictory positions," the defense cannot pick a theory until it knows what that theory has to explain (i.e.,

guilt/innocence only, or both guilt/innocence and penalty), and it cannot meaningfully direct its investigation or develop a legal strategy until it knows its theory of the case.

As to the mitigation investigation unique to capital proceedings, the ABA Guidelines provide that the defense must conduct an investigation "unparalleled" in its scope. *Id.*, Guideline 10.7 (Commentary), *reprinted in* 31 Hofstra L. Rev. at 1022. Supplementary Guidelines promulgated by the ABA in 2008 (the "2008 Supplementary Guidelines") detail the inordinate amount of mitigation investigation and other work required to prepare for a capital sentencing phase. *American Bar Association Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases* (2008), *reprinted in* 36 Hofstra L. Rev. 677. The 2008 Supplementary Guidelines provide, in particular, that:

> The defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death. The investigation into a client's life history must survey a broad set of sources and includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi- generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.
>
> ... Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.
>
> ... Team members must provide counsel with documentary evidence of the investigation through the use of such methods as genealogies, social history reports, chronologies and reports on relevant subjects including, but not limited to, cultural,

socioeconomic, environmental, racial, and religious issues in the client's life. The manner in which information is provided to counsel is determined on a case by case basis, in consultation with counsel, considering jurisdictional practices, discovery rules and policies.

... It is the duty of the defense team members to aid counsel in the selection and preparation of witnesses who will testify, including but not limited to:

1. Expert witnesses, or witnesses with specialized training or experience in a particular subject matter. Such experts include, but are not limited to:

    a. Medical doctors, psychologists, toxicologists, pharmacologists, social workers and persons with specialized knowledge of medical conditions, mental illnesses and impairments; substance abuse, physical, emotional and sexual maltreatment, trauma and the effects of such factors on the client's development and functioning.
    b. Anthropologists, sociologists and persons with expertise in a particular race, culture, ethnicity, religion.

    c. Persons with specialized knowledge of specific communities or expertise in the effect of environments and neighborhoods upon their inhabitants.

    d. Persons with specialized knowledge of institutional life, either generally or within a specific institution.

2. Lay witnesses, or witnesses who are familiar with the defendant or his family, including but not limited to:

    a. The client's family, extending at least three generations back, and those familiar with the client;

    b. The client's friends, teachers, classmates, co-workers, employers, and those who served in the military with the client, as well as others who are familiar with the client's early and current development and functioning, medical history, environmental history, mental health history, educational history, employment and training history, military experience and religious, racial, and cultural experiences and influences upon the client or the client's family;

    c. Social service and treatment providers to the client and the client's family members, including doctors, nurses, other medical staff, social workers, and housing or welfare officials;

    d. Witnesses familiar with the client's prior juvenile and criminal justice and correctional experiences;

> e. Former and current neighbors of the client and the client's family, community members, and others familiar with the neighborhoods in which the client lived, including the type of housing, the economic status of the community, the availability of employment and the prevalence of violence;
>
> f. Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served;
>
> g. Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones.
>
> ... It is the duty of team members to gather documentation to support the testimony of expert and lay witnesses, including, but not limited to, school, medical, employment, military, and social service records, in order to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state, intellectual capacity, and life history that may explain or diminish the client's culpability for his conduct, demonstrate the absence of aggressive patterns in the client's behavior, show the client's capacity for empathy, depict the client's remorse, illustrate the client's desire to function in the world, give a favorable opinion as to the client's capacity for rehabilitation or adaptation to prison, explain possible treatment programs, rebut or explain evidence presented by the prosecutor, or otherwise support a sentence less than death.
>
> ... It is the duty of the team members to aid counsel in preparing and gathering demonstrative evidence, such as photographs, videotapes and physical objects (e.g., trophies, artwork, military medals), and documents that humanize the client or portray him positively, such as certificates of earned awards, favorable press accounts and letters of praise or reference.

2008 Supplementary Guidelines, *reprinted in* 36 Hofstra L. Rev. at 689–92. These standards establish a floor—the minimum effort the defense must expend to fulfill their ethical obligations and enable Mr. Rodriguez's exercise of his constitutional rights.

### B. The government misstates the amount of time needed for federal capital prosecutions.

The government argues that its proposed schedule and proposed trial date are commensurate with the timelines of other federal capital prosecutions. *See* ECF No. 59 at 4 ("the Government's proposed schedule in this case is generally in line with other federal capital cases"). While this may be true as to *some* other federal capital prosecutions, it is not on the

whole correct. The government overlooks that factors common to many capital prosecutions routinely prolong case timelines well beyond two years. In support of its argument, it has cherry-picked outlier cases that are readily distinguishable and are, if anything, case studies in the dangers of moving a capital case too quickly.

Forty-seven federal capital cases have proceeded to trial in the modern capital-trial era (that is, since modern capital trial practice developed in the 2000s following the enactment of the Federal Death Penalty Act ("FDPA")). Excluding those that were delayed significantly by retrials or by the COVID-19 pandemic,[3] it took an average of 14 months for the government to capitally authorize a case after filing the capital indictment, and an average of 28 months to proceed from authorization to voir dire. This meant that the total average time from capital indictment to the start of trial was 42 months. *See* Declaration of Matthew Rubenstein in support of Defendant's Motion for Continuance of Trial Date ("Rubenstein Declaration") at 3-4, ECF No. 142-2, *United States v. Reed*, No. 25-156 (W.D. Okla. Mar. 27, 2026) (attached as Exhibit B). And the notion that there is an "average" timeline as to federal capital prosecutions is somewhat misleading; each capital case has unique features, unique needs, and gives rise to unique hurdles, so it is no surprise that a number of capital cases in the modern era took significantly longer than that average. *See* Ex. A to Rubenstein Declaration (citing, *e.g.*, *United States v. Duong*, No. 01-20154 (N.D. Cal.) (69 months from authorization to trial); *United States v. Basciano*, No. 05-0060 (E.D.N.Y.) (47 months from authorization to trial); *United States v.*

---

[3] The excluded cases are: *United States v. Lecco*, No. 05-107 (S.D.W.V.), *United States v. Wilson*, No. 04-1016 (E.D.N.Y.), and *United States v. Sampson*, No. 01-10384 (D. Mass.), all of which involved retrials; and *United States v. Saipov*, No. 17-722 (S.D.N.Y.) and *United States v. Bowers*, No. 18-292 (W.D. Pa.), which—as the government has emphasized, *see* ECF No. 59 at 4—were delayed due to the pandemic.

*Lujan*, No. 05-924 (D.N.M.) (same); *United States v. Burgos-Montes*, No. 06-0009 (D.P.R.) (58 months from authorization to trial); *United States v. Casey*, No. 05-277 (D.P.R.) (67 months from authorization to trial); *United States v. Williams*, No. 06-079 (D. Haw.) (89 months from authorization to trial); *United States v. Jones*, No. 10-090 (W.D. Mo.) (60 months from authorization to trial). Of course, because no two capital trials are the same, some trials proceed on shorter timelines, as well. *See generally id.*

The government proposes proceeding to voir dire in about half the national average time (and on a timeline similar to that of the average *non*-capital criminal case in this District). In support, it points to three cherry-picked cases—*Council*, *Tsarnaev*, and *Roof*—where trials played out at roughly the government's proposed pace. ECF No. 59 at 4-5. These cases represented the fifteenth, sixth, and second fastest federal capital trials in the modern era, respectively. *See* Ex. A to Rubenstein Declaration. They are readily distinguishable from this prosecution and, if anything, serve more as cautionary tales than exemplars.

First, *Roof* and *Council* are not comparable to this case because they were not anticipated to require lengthy guilt/innocence and penalty proceedings. In fact, Mr. Roof elected to waive the presentation of mitigation entirely. Both cases were resolved (the guilt/innocence and penalty phases) in approximately a total of two weeks. Neither party in this case believes that the guilt/innocence or penalty phases will be similarly brief. This case is expected to require lengthy guilt/innocence and penalty phases, which necessitates a comparably lengthy pretrial phase.

In *Council*—which took 17.5 months to proceed from authorization to the start of voir dire, not "approximately 16 months," *see* ECF No. 59 at 5—the court initially set a trial date for two months after the filing of the complaint. Trial was then continued ***six times*** before it ultimately began two years after the complaint and 17.5 months after authorization. Mr.

Rodriguez's requested schedule is intended to mitigate the risk that the trial date here will need to be continued and, especially, continued multiple times. *Council* is further distinguishable due to the volume of discovery. In *Council*, defense counsel reported that discovery consisted of approximately 3,000 pages, significantly less than the 1.75 TB of discovery (in various forms of media) produced to date in this case—with another hard drive of discovery still outstanding. *See* Motion to Continue at 12, ECF No. 259, *United States v. Council*, No. 17-866 (D.S.C. Sept. 20, 2018).

Dzhokhar Tsarnaev's conviction for the 2013 bombing of the Boston Marathon is still not final. Most recently, in 2024, the First Circuit remanded the case for evidentiary development regarding potential juror bias that went unexplored during voir dire. *United States v. Tsarnaev*, 96 F.4th 441, 452 (1st Cir. 2024). The appellate court blamed the trial court's compressed trial schedule. *See id.* (forgiving defense counsel's failure to timely raise the issue because, "in addition to reviewing over one thousand questionnaires and preparing for and conducting hundreds of individual voir dire sessions, the defense was busy reviewing discovery productions and trial exhibits, litigating pre-trial motions, and otherwise preparing for trial in a high-profile capital case"). More than 13 years after the Boston Marathon bombings, two jurors are still being hauled into court for questioning, and the public is still waiting for closure. *See id.*

In *Roof*, which was tried in the same district as *Council*, the defense made an ill-fated strategic decision to push for an accelerated timeline. *See* Declaration of David I. Bruck in support of Motion to Vacate, Set Aside, or Correct Conviction & Sentence Pursuant to 18 U.S.C. § 2255, ECF No. 1077-5, *United States v. Roof*, No. 15-472 (D.S.C. July 17, 2025). Parallel state-court proceedings were moving "extremely fast," *id.* ¶ 9, and the defense "felt that if the federal trial went forward [first], then the state case would likely end in a plea bargain." *Id.* ¶ 10.

As a result, they "invoke[d] [Mr. Roof's] speedy trial rights" and asked for a "quick trial date." *Id.* As it later turned out, that decision was "based on incomplete information," *id.* ¶ 15, and the defense went "to trial before [it was] ready." *Id.* ¶ 11. Mr. Roof's post-conviction petition alleges that, as a result of the defense's attempt to "run a marathon at the speed of a sprint," the defense missed critical deadlines, failed to retain appropriate experts, began sleeping in shifts to work 24-hour days, and ultimately suffered "irreparabl[e] damage" to their relationship with their client, who fired them, proceeded to the penalty phase *pro se*, waived the presentation of all mitigating evidence, and received 18 death sentences. Motion to Vacate, Set Aside, or Correct Conviction & Sentence Pursuant to 28 U.S.C. § 2255 at 12-13, 105, 106, 108-09, 112, 113-14, ECF No. 1077, *United States v. Roof*, No. 15-472 (D.S.C. July 17, 2025); Judgment, ECF No. 885, *United States v. Roof*, No. 15-472 (D.S.C. Jan. 23, 2017).

In sum, the government's proposed schedule is not, as it claims, "generally in line with other federal capital cases," *see* ECF No. 59 at 4, so much as it is modeled off three handpicked, calamitous outliers. Indeed, the government's proposed schedule is actually "in line with" the average *non*-capital criminal trial length in this District. During the 12-month period from June 2025 to June 2026, the average federal criminal case that proceeded to jury trial in this District took 21.8 months from commencement ("the date an indictment or information was filed") to termination. U.S. Courts, *Table D-6A—U.S. District Courts—Criminal Statistical Tables for the Federal Judiciary* (June 30, 2026), *available at* https://tinyurl.com/hrvvzf47. Some federal circuits had even higher averages: in the Second Circuit, for example, the average federal criminal case that proceeded to a jury took 34.2 months from commencement to termination, and cases in the Third Circuit took 30.3 months. *Id.* The national average for all federal criminal cases proceeding to trial was 22 months. *Id.* Compare this to the government's proposal, which

would have trial in a capital case begin 25 months after the filing of the indictment. The government suggests that the defense should have roughly as much time to conduct an "ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense," *see* 2008 Supplementary Guidelines, as it might have to investigate a run-of-the-mill robbery or drug-distribution case.

What is more, the government's single-minded focus on establishing a "firm" trial date at this juncture overlooks the reality that initial trial dates in capital cases—particularly those set this early in the prosecution—rarely (if ever) "stick." This is especially true in the cases cited by the government, which adopted artificially accelerated timetables that ultimately needed to be continued. In *Council*, the court granted three post-NOI continuances, one of which occurred two months before the then-scheduled trial date and delayed the start of trial by nine months. In *Tsarnaev*, the court delayed the start of trial by two months only six weeks before the trial was scheduled to begin.

A more recent and illustrative example is *United States v. Gendron*, involving the May 2022 mass shooting in Buffalo. The court's initial scheduling order set voir dire to begin in September 2025. Discovery disputes, unanticipated pretrial litigation, and investigation delays forced the court to reschedule the start of voir dire twice—first for January 2026 and then for August 2026. The government then took an interlocutory appeal which was not resolved until late July 2026, forcing the court to delay voir dire yet again. Voir dire is now scheduled to start in mid-October 2026. If it goes forward, it will have taken the court 34 months to proceed from the filing of the NOI to the start of voir dire, nearly twice the amount of time that the victims and community were originally led to expect, and more than twice the length the government proposes here.

This is all to say that although no two capital cases are the same, all capital cases necessitate a substantial expenditure of time. The government may claim that its exemplars prove quicker paths are possible, but the cases it cites are exceptions that prove the rule: *Council*, *Roof*, and *Tsarnaev* are warnings, not targets. And the weight of the capital-trial history in the modern era makes clear that the 16-month timeline from authorization to voir dire proposed by the government is much shorter than what is typically needed to prepare a capital case for trial.

### C. This case is as complex as, if not more complex than, other federal capital prosecutions.

Even if the government were right to imply that the average capital case takes two years to prosecute from the time of indictment to trial (which it is not), that timeline would still be inadequate here because this is not the average federal capital case. As discussed *supra*, each case has unique needs and circumstances, and this case is one in which a trial less than 16 months post-authorization is unrealistic. For one thing, the volume of discovery, particularly electronic discovery, that the defense must review is massive. The discovery that has been produced to date is deficient, and while the defense has raised these issues with the government and hopes to resolve them without the Court's involvement, defense counsel remain unable to conduct a holistic review of the government's evidence as it pertains to Mr. Rodriguez's guilt or to consider its potential relevance to mitigation.

Because of the accelerated timeline under which the government asked the defense to prepare its mitigation presentation, and because that process involved multiple defense submissions and meetings between the government and the defense over the course of several months, the defense has had only a limited opportunity to begin its review of that discovery as its efforts have been focused on avoiding an authorization request, which required significant time in the field to try to gather documents and establish relationships necessary for a mitigation

investigation. This required members of the defense (located in multiple cities nationwide) to travel on repeated occasions to a number of locations around the country, to gather voluminous records, to review those records as much as possible and gather *more* records based on their findings, to interview witnesses, and to work to build trust with the people who know Mr. Rodriguez—all just a beginning of the constitutionally required investigation and preparation of mitigation. *See supra* § II.A. Perhaps most importantly, the focus on avoiding authorization required members of the defense to meet with Mr. Rodriguez on a regular basis (often requiring travel to Washington, D.C.) in order to develop the relationship with Mr. Rodriguez that was necessitated by the high stakes of the pre-authorization process and crucial to counseling Mr. Rodriguez about his ultimate offer to plead guilty and accept a sentence of life without the possibility of parole, which would have enabled the government to forego a capital trial altogether. And preparation for the authorization process required the defense to review massive amounts of discovery in a format not amenable to easy review. While it is true that some of these efforts will, to some extent, assist the defense with trial preparation, the accelerated timeline meant that the work that preceded the capital authorization of this case was largely focused on avoiding authorization and on proposing a plea.

The effects of this accelerated timeline on defense efforts were compounded both by last year's federal budgetary shortfall and by the unprecedented rise in new federal prosecutions in the District of Colombia. Two of Mr. Rodriguez's lawyers, as well as additional members of the defense team, work for the Office of the Federal Public Defender for the District of Columbia, and the onslaught of new cases that resulted from an increased federal law-enforcement presence here had a dramatic effect on their workloads and hampered their abilities to spend time on this case. Those team members also went for a period of three and a half weeks without pay starting

in October 2025 due to the lapse in appropriations that resulted from the federal government shutdown last fall. Undersigned learned counsel, a Criminal Justice Act attorney, went unpaid for months, from appointment in this case until November 13, 2025, which meant he had to devote time to other, paid cases. The lapse in appropriations also impacted the ability of capital defense teams nationwide to retain and pay experts and to travel for investigative purposes. All of this took place while the defense was preparing to make its mitigation presentation to the government, a critical juncture in Mr. Rodriguez's case. *See also generally* ECF No. 34 at 21; Hearing Tr. (Sept. 24, 2025) at 19.

Further complicating matters is the fact that the conditions under which Mr. Rodriguez is confined continue to hinder mitigation efforts in various ways, including by restricting the ability of members of the defense to meet and review discovery with their client. *See generally* ECF No. 52 (sealed motion concerning conditions of confinement). While the defense acknowledges and appreciates that the Court is attempting to alleviate these issues, the fact remains that over the past 15 months, Mr. Rodriguez's conditions of confinement—particularly those due to his perceived status as a high-profile inmate—presented, and continue to present, unique challenges for the defense's mitigation efforts during this period.

While it may be appropriate for the Court to consider "typical" or "average" capital cases in fashioning a scheduling order—these cases set a rough roadmap for what the parties and the Court can realistically expect—this is not the whole picture. Every case is unique, and this case has unique complications of its own. The national average favors a timeline longer than what the government has proposed, and this case warrants even more flexibility than that.

## III. The Scheduling Approach Proposed by the Defense Is Realistic and Constitutionally Feasible.

In view of these considerations, Mr. Rodriguez submits a proposed schedule (Ex. A). It seems the defense and the government agree on a key feature: both parties have proposed a multi-tiered litigation approach, with litigation that would be dispositive of the death penalty preceding the filing of "non-capital pretrial motions/challenges" and "general motions." ECF No. 59 at 6 (government's submission); Ex. A (defense submission). This phased approach is sensible and efficient. It will enable the Court to address, early on, any challenges to the capital nature of this case, and a decision on any such motion will determine the trajectory of the prosecution.

However, Mr. Rodriguez has proposed a phased approach to motions that is more detailed than the government's proposal. Additionally, Mr. Rodriguez submits that it would be premature and unrealistic to schedule any trial date at all at this juncture. Accordingly, the defense proposes that, instead of setting a trial date now and imposing a forced schedule around that date, the more judicious approach is for the Court to set deadlines for initial phases of dispositive and discovery-related litigation. Then, after those issues are resolved, the parties will be in a better position to submit deadlines for additional litigation and, eventually, for a feasible trial date.

### A. A phased approach to motions is appropriate.

Due to the complexity of death-penalty cases like this one, courts around the country have concluded that organizing pretrial litigation into phases is an effective way of managing capital cases. Such organization recognizes that litigation depends on the outcome of prior litigation—for example, that resolution of discovery and disclosure questions bears directly on the litigation of other issues. This structure also facilitates a narrowing of the issues, which in

turn promotes judicial efficiency by ensuring that courts do not need to entertain matters that later become moot based on earlier rulings, additional government disclosures, or the result of defense investigation. And it keeps the proceedings "on track" while establishing reasonable expectations for everyone involved, including the affected community and the general public. For these reasons, courts in a number of recent capital cases have set schedules that required the parties to resolve discovery disputes early on, to prioritize the filing of motions that could be litigated prior to the resolution of discovery issues, and to address potentially case- and count-dispositive legal questions before undertaking the time-consuming work of establishing the scope of admissible evidence and establishing procedures for trial. *See, e.g.*, Amended Scheduling Order, ECF No. 159, *United States v. Reed*, No. 25-156 (W.D. Okla. June 2, 2026) (phased scheduling order adopting defense's proposed approach and ordering discovery litigation to be followed by challenges to death penalty, with dates concerning litigation of trial issues to follow, but not setting trial date) (attached as Exhibit C); Initial Scheduling Order, ECF No. 205, *United States v. Petty*, No. 25-123 (D. Colo. Apr. 27, 2026) (phased scheduling order staging discovery production, discovery litigation, and litigation of challenges to death penalty, followed by conference between parties, but no trial date) (attached as Exhibit D); Scheduling Order, ECF No. 136, *United States v. Cox*, No. 25-91 (S.D.N.Y. Apr. 8, 2026) (setting deadlines for initial phases of pretrial litigation while deferring setting of trial date) (attached as Exhibit E); Scheduling Order, ECF No. 139, *United States v. McBean*, No. 24-541 (S.D.N.Y. July 8, 2025) (setting deadlines for discovery motions and "death-penalty related motions" without setting trial date) (attached as Exhibit F); Arraignment Tr. at 15-17, ECF No. 27, *United States v. Mangione*, No. 25-176 (S.D.N.Y. Apr. 29, 2025) (setting tiered motions schedule, and deferring scheduling of trial date) (attached as Exhibit G); *cf.* Text Scheduling Order, ECF No. 141, *United States v.*

*Gendron*, No. 22-109 (W.D.N.Y. Feb. 2, 2024) (establishing tiered litigation, and also setting trial date which later had to be continued multiple times); Entry Following Scheduling Conference of August 22, 2017, ECF No. 46, *United States v. Rogers*, No. 16-18 (W.D. Okla. Aug, 24, 2017) (in scheduling order issued 15 months after NOI, setting timeline for pretrial filings but no trial date) (attached as Exhibit H).

In line with these examples, Mr. Rodriguez has proposed foundational tiers of litigation in addition to the early phase of capital-motions litigation on which the parties agree. This phased approach will enable the Court to address and resolve motions that do not hinge on discovery while the parties are in the process of completing discovery production, addressing discovery issues, and preparing motions that depend on the information produced in discovery. Mr. Rodriguez proposes an initial phase that encompasses extensive, preliminary legal challenges that are not dependent on discovery, including motions to dismiss counts or to dismiss the indictment in its entirety pursuant to Fed. R. Crim. P. 12(b)(3). *See* Ex. A at 1. This litigation will be exhaustive, and it will take time; but it can happen at the same time that discovery issues are being litigated and resolved. Mr. Rodriguez proposes this phase as a way for the parties to make early progress on the litigation that can happen soonest.

While this preliminary phase of dispositive litigation is ongoing, Mr. Rodriguez proposes that the government fulfill its discovery obligations pursuant to Fed. R. Crim. P. 16 and *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Ex. A at 1–2. Once the government has done so, Mr. Rodriguez proposes that the parties undertake a second foundational phase of litigation to resolve any discovery issues. To be sure, discovery has been ongoing for some time, and defense counsel have communicated with the government about discovery deficiencies. But Mr. Rodriguez anticipates that in this case—as in many criminal matters—at least some discovery issues will

require the intervention of the Court. Among other things, the defense will likely move for a bill of particulars, for an informational outline[4] regarding the government's noticed aggravating factors, and for discovery relating to the statutory and non-statutory aggravating factors contained in the NOI, as well as for discovery relating to potential mitigating factors and case-specific discovery. All of these issues can be resolved while the litigation of preliminary legal challenges that do not turn on the production of discovery is ongoing.

Mr. Rodriguez proposes that after the Court has resolved any outstanding discovery issues and the government has produced any remaining discovery in response, the defense then file other dispositive motions, which may depend on the contents of the government's discovery productions. Ex. A at 2. This may include (but is not necessarily limited to) motions to strike the NOI and Grand-Jury-related challenges.

After that, Mr. Rodriguez proposes that the parties litigate any motions dispositive of the alleged statutory and non-statutory aggravating factors. These motions, which may be fact-bound and discovery-dependent, are likely to be extensive, and Mr. Rodriguez proposes phasing them after the resolution of other dispositive motions for purposes of efficiency: if Mr. Rodriguez prevails on any of his death-penalty-based challenges (including those that depend on the outcome of the discovery litigation), then there will be no reason to challenge the charged aggravating factors. More importantly, the defense will be unable to mount meaningful

[4] Informational outlines are used to provide defense counsel with meaningful advance notice of the facts and categories of evidence the government intends to rely on to prove the aggravating factors it has alleged under 18 U.S.C. § 3953(a). Providing this information prior to trial streamlines the investigation and litigation necessary for defense counsel to move to exclude and/or prepare to meet such evidence in accordance with their stringent obligations as counsel in a death penalty case. For these reasons, while such an outline is not statutorily required, an overwhelming number of district courts in federal capital prosecutions have recognized their utility and directed the government to provide them.

challenges to the government's proposed aggravating factors until it receives complete discovery and knows the contours of the proof that the government intends to rely on to establish those factors. Furnishing the defense with the information necessary to file these motions is the purpose of the informational outline that the defense will request during the discovery phase of the litigation.

The defense has proposed deadlines for the completion of discovery production by the government and for the filing of facial challenges to the indictment twelve weeks after the entry of any scheduling order, with remaining challenges to the death penalty to be filed eight weeks after the resolution of discovery issues. This is within the range of the timelines set in other recent capital cases, and, if anything, is *more* accelerated than the timelines in those matters. *See* Ex. D, Scheduling Order, *United States v. Petty* (discovery motions due 15 months, and death-penalty challenges due 18 months, after filing of NOI); Ex. C, Scheduling Order, *United States v. Reed* (discovery motions due 16 months, and death-penalty challenges due 18 months, after filing of NOI); Revised Scheduling Order, ECF No. 243, *United States v. Franklin, et al.*, No. 24-167 (E.D. Okla. Mar. 30, 2026) (death-penalty challenges due 18 months after filing of NOI) (attached as Exhibit I); Ex. E, Scheduling Order, *United States v. Cox* (discovery motions due 14 months, and death-penalty challenges due 11 months, after filing of NOI); Scheduling Order, *United States v. Flores-Tavarez*, ECF No. 224, No. 24-133 (D.P.R. May 20, 2026) (discovery motions due 14 months, and death-penalty challenges due 15 months, after filing of NOI) (attached as Exhibit J). In this case, the defense proposal would have discovery motions due less than nine months after the filing of the NOI, dispositive motions due just over seven months after the filing of the NOI, and—depending on how long it takes to resolve discovery disputes—other death-penalty challenges due roughly 12 or 13 months after the filing of the NOI.

### B. The parties should confer after these initial phases.

Mr. Rodriguez has proposed that, after the foundational phases of discovery and litigation described above are complete, the parties meet and confer regarding the scheduling of additional pretrial deadlines and then make joint or separate proposals to the Court regarding those deadlines. Ex. A at 3. As the government concedes, it "does not have sufficient information to provide the Court with a comprehensive list of pretrial issues" at this time. ECF No. 59 at 2. Neither does Mr. Rodriguez. Once the initial, foundational phases of litigation are complete, the parties will be in a position to propose a more realistic schedule for further proceedings that includes additional pretrial motions (such as suppression motions and motions *in limine*), expert disclosures and related motions, any litigation pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), and motions establishing procedures for jury selection and trial. To ensure that the litigation process continues uninterrupted, the defense has proposed that the Court schedule a control date two weeks after the rulings on the initial phases of motions requiring the parties to confer and then submit proposals for the next litigation phases.

### C. The Court should set a trial date only when the litigation has progressed sufficiently to permit a more realistic date to be set.

The Court should defer the scheduling of a trial date until after the resolution of discovery issues and early, critical phases of pretrial litigation, at which point the parties will be in a position to propose a trial date that is more realistic and allows defense counsel to fulfill their constitutional and ethical obligations and vindicate their client's Sixth Amendment rights. Waiting to schedule a trial until the parties have a clearer picture of the case—including most

importantly whether it will be a capital trial[5]—allows for the foundational motion practice and investigation to be completed and for a realistic trial schedule to be more fully contemplated once that litigation is complete. This is not an uncommon approach. *See supra* § III.A (citing examples). Out of the 30 defendants against whom federal capital prosecutions are currently pending, only 14 have trial dates calendared, and six of those trial dates are after 2027. (One of the pre-2028 trial dates is the October 2026 date in *Gendron*, which was indicted in 2022 and authorized during the Biden administration.) Suffice it to say that what the defense requests is not at all out of the ordinary.

The immediate lead-up to a lengthy capital trial will require the commitment of extraordinary time and resources above and beyond those required to be expended by the parties. Extensive time and effort will likely be required by the Court and its staff to review and decide a constant flow of motions, up to the start of voir dire and beyond (and, in fact, many anticipated motions will need to be resolved before jury summons can even go out). Defense counsel will also need to limit their caseloads (which, for the D.C.- and Philadelphia-based Assistant Federal Defenders, will require coordination within their respective offices) and will need time to

[5] As an example, the pretrial litigation that will enable this to become clearer includes challenges to the death-eligible charges under 18 U.S.C. §§ 924(c) and (j) alleged in Counts Four and Five. *See, e.g.*, *United States v. Ahemeid*, 819 F. Supp. 3d 143 (E.D.N.Y. 2026) (dismissing authorized § 924(j) charges on the basis that charged predicate, a violation of 18 U.S.C. § 1111(a), is not categorically a crime of violence); *United States v. Mangione*, 818 F. Supp. 3d 509 (S.D.N.Y. 2026) (applying modified categorical approach to conclude that authorized § 924(j) charge must be dismissed because interstate-stalking predicate did not require use, attempted use, or threatened use of force); *cf. Barrett v. United States*, 607 U.S. 128 (2026) (prohibiting simultaneous convictions under §§ 924(c) and (j) for same act); Brief of Appellee at 71-72, *United States v. Jordan*, No. 25-2156 (8th Cir. Aug. 3, 2026) (government concession that *Barrett* precludes district courts from sentencing convicted defendants on a violation of § 924(j) and the charged predicate).

transition off of their other cases in order to be able to provide constitutionally adequate representation to each of their clients.

The sheer logistics of staging a capital trial, particularly a high-profile one, also impose an enormous amount of extra work upon courthouse staff tasked with coordinating the courtroom and administering the court calendar. The work of the jury administrator begins many months before trial actually commences (often as many as six months prior to the start of jury selection), in order to identify and summon hundreds if not thousands of potential jurors, oversee the completion of extensive written questionnaires, coordinate requests for excusal, and ultimately ensure that a sufficient number of venirepersons are present in court on the day voir dire begins. (For reference, in *Gendron*, 3,000 summonses were sent out to obtain roughly 1,200 qualified jurors to complete the questionnaire. These summonses were sent out in late March 2026 for the then-scheduled August 2026 start of voir dire, and questionnaires were completed in mid-June. *See* Minute Entries, ECF Nos. 561, 594-596, 602-603, & 611-614, *United States v. Gendron*, No. 22-109 (W.D.N.Y. Mar. 20, 2026 & June 15-17, 18, 22, & 23-26, 2006).) In this case, the government has proposed that juror questionnaires be completed in early June 2027, which means the parties, Court, and jury administrator would need to be in a position to send out questionnaires in March 2027—some six months from now.

If dictated by a trial date set a year or more in advance that ultimately proves unworkable, some of these efforts could be for nought. It is a significantly more efficient allocation of critical resources to complete the initial phases of motions, especially determination of whether the case will be capital, followed by the remainder of the pretrial litigation, and then to set a trial date informed by the actual pace and nature of the prosecution.

Setting a trial date at this juncture would artificially compress the pretrial timeline and deny Mr. Rodriguez and his counsel the opportunity to undertake the preparation needed for a capital trial. It would create unrealistic expectations and necessitate the premature commitment of resources to an event that might well be postponed (or not happen at all). It would also risk delaying finality via drawn-out and complex post-trial proceedings that result in reversals or retrials. In contrast, adopting the defense proposal will avoid creating unrealistic expectations for the public, the affected community, and the victims and victims' families. A capital trial in this case would undoubtedly be a highly anticipated and intensely difficult time for all concerned. Any steps that minimize the likelihood of requiring those most deeply affected by the event at issue to ready themselves for trial more than once are therefore worthy of the most serious consideration. The goals of keeping this case "on track" and achieving a timely resolution of this matter—goals that the defense shares with the government—can be accomplished through a scheduling order that sets realistic, comprehensive deadlines, establishes control dates for the parties to confer, and defers the scheduling of a trial date.

## IV. The Government's Proposed Schedule Is Not Constitutionally or Practically Feasible.

Meanwhile, the government has proposed a schedule that is inadequate as a constitutional matter and unworkable as a practical matter. For instance, the government has proposed a schedule that would require the defense to file dispositive motions and challenges to Special Findings and to the NOI only four months after the filing of the NOI and before the status date the Court set for discussion *of scheduling*. The government's schedule would also force the defense to make an extremely early production of reciprocal discovery, before the government has complied with its discovery obligations, and without imposing any discovery deadline on the government. And the government would have the parties and the Court begin trial in this

complex capital matter barely over a year from today, only 16 months after the filing of the NOI and only 18 months after Mr. Rodriguez was arraigned on the operative indictment.

**A. The government's trial-date proposal is premature and unrealistic.**

For myriad reasons discussed above, *see supra* §§ II.B, III, setting a trial date at this juncture would compound, not mitigate, uncertainty over the timeline of this case. But even if the Court were to set a trial date now, the date proposed by the government is not commensurate with the complexity of this case (or that of capital cases generally).

Undersigned counsel have been working diligently to prepare this case. But to fulfill their ethical duties and vindicate Mr. Rodriguez's Sixth Amendment rights, counsel must continue to thoroughly investigate both phases of trial and all potentially available evidence related to guilt/innocence and penalty. *See* ABA Guideline 10.7. Counsel must also prepare and litigate *all* viable motions. Counsel must identify appropriate guilt/innocence- and penalty-phase mental-health and non-mental-health experts, work with these experts, and—when the government identifies its own experts—assess those experts' findings and potentially work with rebuttal experts. *See Hinton v. Alabama*, 571 U.S. 263, 274 (2014); *Harrington v. Richter*, 562 U.S. 86, 106 (2011). While some of this work has begun, it cannot reasonably be completed within a year (particularly since the defense still awaits significant discovery the government has promised is forthcoming, and there is sure to be additional discovery the defense will seek). The trial date proposed by the government would deprive Mr. Rodriguez of the effective defense to which *any* criminal defendant is constitutionally entitled, particularly one facing the most serious of criminal penalties.

### B. The government's proposed motions schedule is impractical and overlooks key phases of litigation.

The government's proposed pretrial deadlines cannot be squared with the practicalities of this case. The government proposes that the defense file its challenges to the death penalty on September 14, a mere three weeks from now, and two weeks before the next status conference, which defense counsel understood to be for the purpose of discussing scheduling proposals if the Court has not issued a scheduling order by then. *See* Hearing Tr. (June 30, 2026) at 8 (Court stating, "And then why don't we go ahead and pick a date in September for a further status conference. And I may have been able to enter a scheduling order before then, but if not, we can hammer things out at the status conference."). The government would also have the defense file these motions before discovery is complete. While the government's motions schedule sets unrealistic deadlines, it also omits deadlines and timelines for the litigation and filing of other types of motions, such as discovery motions and Grand-Jury-related motions. And the government's proposal builds in no time for the Court to consider and rule on the motions the parties file.

### C. The government's proposed schedule ignores the status of discovery.

The government's proposed schedule ignores the quantity of discovery produced to date, the time needed to fully review and analyze that discovery, and the fact that the government's production of discovery is not complete. Although the government initially produced two files shortly after Mr. Rodriguez's arrest, further discovery was not provided until over three months after the initiation of the case, in August 2025. The government made another production in November 2025. Since then, the government has provided no updated discovery, despite indicating prior to the status conference on June 30, 2026, that production of an additional hard drive's worth of discovery was imminent. Counsel for Mr. Rodriguez followed up with

government counsel regarding the status of that discovery, but to date no production has been made. Defense counsel have diligently been working to review the 1.75 TB of discovery provided to date. The volume and format of discovery necessitate considerable pretrial time that is not accounted for by the government's proposal.

**D. The government's production and disclosure proposal is unworkable.**

The disclosure-related deadlines proposed by the government do not account for the realities of a capital case. As noted, *supra*, the government sets a very quick deadline for defense discovery but sets no deadline *whatsoever* for the fulfillment of its own discovery obligations. The defense will be in no position to determine what it may seek to introduce at trial until it reviews all information required to be produced by the government.

It would be appropriate for the Court to set a discovery deadline for reciprocal defense discovery—at least that relating to the penalty phase—only after a verdict at the guilt/innocence phase. *See, e.g.*, *United States v. Smith*, No. 16-86, 2019 WL 11863733 (D. Alaska Dec. 9, 2019); *United States v. Christensen*, No. 17-37, 2019 WL 1976442, at *7 (C.D. Ill. May 3, 2019); Text Order, *United States v. Con-Ui*, No. 13-123 (M.D. Pa. June 2, 2017); *United States v. Fell*, No. 01-12, 2017 WL 10940934 (D. Vt. Jan. 27, 2017). Aside from Rule 12.2, nothing in the FDPA or the Federal Rules of Criminal Procedure governs discovery from the defense at the penalty phase of a capital trial. Additionally, the government proposes that the defense submit any Rule 12.2(b)(1) and (2) notices in approximately seven months (five months before trial) and that it disclose *all* of its experts (not just guilt/innocence-phase experts) at the same time. *Cf. United States v. Edelin*, 134 F. Supp. 2d 45, 58 (D.D.C. 2001) (giving defense until one month before jury selection to file 12.2 notice). And the government proposes that the defense provide its witness list and "proposed mitigating factors" for the penalty phase prior to jury selection, which is not supported by statute, would interfere with Mr. Rodriguez's constitutional rights, and

is inconsistent with the approach taken by many other courts. *See, e.g.*, *Fell*, No. 01-12, 2017 WL 10940934 (D. Vt. Jan. 27, 2018); *United States v. Council*, No. 17-866, 2018 WL 2090643 (D.S.C. May 2, 2018); *Con-Ui*, No. 13-123 (M.D. Pa. June 2, 2017). *United States v. Lujan*, No. 05-924, ECF No. 1212 (D.N.M. Aug, 24, 2011). Whereas the defense has proposed that the parties and the Court defer the scheduling of expert- and notice-related deadlines and deadlines for reciprocal discovery until the initial phases of motions are complete, the government's timeline would force the defense to finalize and preview its penalty-phase theory well before the guilt/innocence phase has even occurred, and likely before the Court has had an opportunity to consider and rule on substantive motions.

### E. The government's proposed schedule misapplies the Crime Victims' Rights Act.

The government's proposed timeline, which purports to serve the interests and rights of the victims and the affected community, risks doing the opposite. The defense does not doubt the government's assertion that these affected parties—and all involved—would benefit from "an understanding of when they may anticipate a trial in this case." ECF No. 59 at 2. But the government's proposal skews and distorts any such understanding by setting unreasonable expectations for when a trial might realistically occur, and when interim phases of litigation might realistically take place. The government's proposal, which omits key phases of litigation and forces the defense to prepare motions without the benefit of full discovery, creates the risk of causing and aggravating delays. In contrast, any risk of delays inherent in a complicated

proceeding can be mitigated by a realistic schedule that builds in adequate time for each phase and does not set unrealistic and artificial deadlines just for the sake of setting deadlines.[6]

The government cannot save its argument by invoking the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771. The CVRA was enacted with the laudable aim of ensuring that crime victims are treated with dignity and respect during criminal proceedings. Accordingly, it establishes, among other things, the right of victims (including decedents' family members) "to proceedings free from *unreasonable* delay." *Id.* § 3771(a)(3) (emphasis added). What it does *not* do is negate the constitutional or statutory protections afforded to criminal defendants. Congress "did not mean to undermine the Speedy Trial Act … , nor to deprive either criminal defendants or the government of a full and adequate opportunity to prepare for trial." *United States v. Tobin*, No. 04-216, 2005 WL 1868682, at *2 (D.N.H. July 22, 2005); *see also United States v. Yamashiro*, 788 F.3d 1231 (9th Cir. 2015) (crime victims' "nearly unfettered right to be heard at sentencing under the" CVRA did not trump defendant's Sixth Amendment right to counsel). After all, "the defendant's right to adequate preparation is … of constitutional significance." *Tobin*, 2005 WL 1868682, at *2. With this in mind, the CVRA does not "require courts to adopt every conceivable procedure that might protect the exercise of victims' rights." *United States v. Turner*, 367 F. Supp. 2d 319, 323 (E.D.N.Y. 2005).

The use of the term "reasonable" in the statute is therefore "important: 'reasonable' provides vital flexibility" to account for the interests recognized by the CVRA without interfering with a defendant's exercise of his constitutional rights. *Id.* at 332; *see also United*

---

[6] To the extent that the government's goals are to avoid uncertainty and to bring this matter to a close, these goals can be accomplished through the plea and acceptance of a life sentence that Mr. Rodriguez has offered.

*States v. Stine*, No. 13-491, 2015 WL 4639734, at *3 (D. Colo. Aug. 15, 2015) ("Congress included the term 'reasonable' as a limitation on victims' rights"). This is particularly significant when it comes to the CVRA's provision regarding proceedings "free from unreasonable delay." *See* 18 U.S.C. *Id.* § 3771(a)(3). "The Senate sponsors of the CVRA were explicit in their view that the statutory right to proceedings free from unreasonable delay neither 'curtail[s] the Government's need for reasonable time to organize and prosecute its case' nor 'infringe[s] on the defendant's due process right to prepare a defense.'" *Turner*, 367 F. Supp. 2d at 334 (quoting 150 Cong. Rec. S4260-01 (Apr. 22, 2024) at S4268–69 (statement of Sen. Kyl)).

Recently, in this District, Judge Friedman addressed the CVRA's "reasonable time" inquiry in the context of a victim's challenge to the delay of a sentencing meant to enable the parties to better prepare for the proceeding. In assessing the reasonableness of the timeline, Judge Friedman noted that he was obligated to "balance the victim's interest in avoiding unreasonable delay against [the] defendant's right to file post-trial motions and the government's right to defend against them, particularly in" a complicated case like the one before him. *United States v. Sutton*, No. 21-598, 2024 WL 2846768, at *3 (D.D.C. June 5, 2024). In doing so, he noted that the CVRA "only gives victims 'a voice but not a veto,'" because "[t]he government and the defendants have rights as well." *Id.* (quoting *Turner*, 367 F. Supp. 2d at 331, and citing *Tobin*, 2005 WL 1868682, at *2).

The Court and the defense have been, and will undoubtedly continue to be, cognizant of the impact of these proceedings on the victims. It has been a point of emphasis in all prior defense communications with the government and a significant factor in Mr. Rodriguez's (still standing) offer to plead guilty and accept a sentence of life without the possibility of parole. However, the avoidance of unreasonable delay in service of the rights of the victims does not

require the Court to undercut Mr. Rodriguez's constitutional rights or his ability to adequately prepare for trial. While a scheduling approach that accounts for the constitutional and practical realities would necessitate a trial date beyond the unrealistic date that the government has proposed, it would not do so *unreasonably*. To the contrary, for the many reasons set forth in this memorandum, Mr. Rodriguez's proposal would ultimately lead to a trial (or other resolution) on constitutionally firm footing without *undue* delay.

## V. Conclusion

In a weighty case involving the most serious criminal penalty, the parties and the Court cannot cut corners. Yet the government has asked the Court to join it in doing just that, purportedly in service of a prompt and final resolution. Ironically, its proposal risks the opposite, while simultaneously undercutting defense counsel's fulfillment of their ethical obligations and, more importantly, interfering with Mr. Rodriguez's exercise of his constitutional rights. In recognition of these factors, courts around the country have adopted capital pretrial schedules that share key features with the defense proposal. For the foregoing reasons, the defense respectfully requests that the Court reject the government's proposed schedule, join the reasoning of these other courts, and adopt Mr. Rodriguez's proposed approach.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

*/s/ Diane Shrewsbury*
Elizabeth Mullin
Diane Shrewsbury
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500

Eric K. Klein
Johnson & Klein, PLLC
5398 Manhattan Circle
Boulder, CO 80303
(303) 444-1885

Victor J. Abreu
Supervisory Assistant Federal Defender
Federal Community Defender Office, EDPA
601 Walnut Street, Ste 540 West
Philadelphia, PA 19106
(215) 928-1100